UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                                   :
MAXON HYUNDAI MAZDA, *et al.*,                                     :
                                                                   :
                                                Plaintiffs,        :
                                                                   :
                     - against -                                   :   No. 13 CV 2680 (AJN) (RLE)
                                                                   :
CARFAX, INC., a Pennsylvania corporation,                          :
                                                                   :
                                                Defendant.         :
                                                                   :
-------------------------------------------------------------------X


BRIEF IN SUPPORT OF MOTION PURSUANT TO FEDERAL RULE OF CIVIL
PROCEDURE 12(b)(6) TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

Christopher M. Mason (CM 7146)
NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
Telephone:  (212) 940-3000
Facsimile:  (212) 940-3111
cmason@nixon eabod .cc

Attorneys for Defendant
Carfax, Inc.


Of Counsel:

Fredric C. Nelson
Sara E. Farber

Dated:  December 17, 2013


14730060 1

Table of Contents

Page

Table of Authorities ............................................................................................ iii

Preliminary Statement ......................................................................................... 1

Statement of Facts ............................................................................................... 4

Argument ............................................................................................................. 13

I.      PLAINTIFFS FAIL TO STATE A CLAIM
UNDER SECTION 3 OF THE CLAYTON ACT .......................................... 16

      A.     Plaintiffs Have Not Adequately Pleaded a
Relevant Product and Geographic Market
for a Commodity ................................................................................ 16

      B.     Plaintiffs Have Not Adequately Pleaded
Any Exclusive Agreement that by Its Terms
Could Harm Competition ................................................................... 20

      C.     Plaintiffs Cannot Cure the Deficiencies
in their Claims with Arguments About
"De Facto Exclusivity" ...................................................................... 25

            1.     Carfax's Market Share ............................................................. 28

            2.     Carfax's Marketing Message .................................................... 29

            3.     Cash and Non-Cash Payments .................................................. 29

            4.     Website Exclusivity .................................................................. 30

            5.     Barriers to Entry ...................................................................... 31

            6.     Post-Complaint Action by
Autotrader ............................................................................... 31

      D.     Plaintiffs Have Not Adequately Pleaded
Foreclosure of a Substantial Share of the
Market .............................................................................................. 31

II.     PLAINTIFFS FAIL TO STATE A CLAIM
UNDER SECTION 1 OF THE SHERMAN ACT ........................................... 35

|  |  |  | Page |
|---|---|---|---|
| III. | PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT ............................................ | | 38 |
|  | A. | Plaintiffs Have Failed To State a Claim of Monopolization .................................................................. | 38 |
|  | B. | Plaintiffs Have Failed To State a Claim of Attempted Monopolization ................................................ | 40 |
| Conclusion ............................................................................................................ | | | 40 |

Table of Authorities

Cases                                                                        Pages

*Allied Orthopedic Appliances Inc. v.*
    *Tyco Health Care Grp. LP,*
    592 F.3d 991 (9th Cir. 2010) ...........................................................................   36

*Ambook Enters. v. Time, Inc.,*
    612 F.2d 604 (2d Cir. 1979)..............................................................................   17 n.16

*Am. Express Travel Related Servs. Co. v.*
    *Visa U.S.A.,*
    No. 04 Civ. 8967 (BSJ), 2005 U.S. Dist.
    LEXIS 42852 (S.D.N.Y. 2005)..........................................................................   26, 27 n.26

*Amidax Trading Grp. v.*
    *S.W.I.F.T. SCRL,*
    607 F. Supp. 2d 500
    (S.D.N.Y. 2009)..................................................................................................   14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).............................................................................................   4, 14, 15,
                                                                                                                           28

*Balakaw v. Lovell,*
    14 F.3d 793 (2d Cir. 1994)..................................................................................   24

*Barry Wright Corp. v. ITT*
    *Grinnell Corp.,*
    724 F.2d 227 (1st Cir. 1983)...............................................................................   32

*Baum v. Investors Diversified Servs. Inc.,*
    409 F.2d 872 (7th Cir. 1969) ..............................................................................   17 n.16

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..............................................................................................   4, 14, 15,
                                                                                                                           28, 35

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962)..............................................................................................   5

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977)..............................................................................................   35 n.28

*CDC Techs., Inc. v. IDEXX Lab., Inc.,*
    186 F.3d 74 (2d Cir. 1999)...................................................................................   *passim*

| Cases | Pages |
|---|---|
| *CDC Techs., Inc. v. IDEXX Lab., Inc.*, 7 F. Supp. 2d 119 (D. Conn. 1998), *aff'd*, 186 F.3d 74 (2d Cir. 1999) .................... | 22 |
| *Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002).................... | 12 n.13, 25 |
| *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008).................... | 12 n.13 |
| *Comm. Data Servers, Inc. v. IBM*, 262 F. Supp. 2d 50 (S.D.N.Y. 2003).................... | 35 |
| *Comm. Data Servers, Inc. v. IBM*, No. 00 Civ. 5008 (CM), 2002 U.S. Dist. LEXIS 5600 (S.D.N.Y. Mar. 15, 2002) .................... | 16 |
| *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000) .................... | 26, 30 |
| *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F. 3d 91 (2d Cir. 2007).................... | 35 n.28 |
| *Corsearch, Inc. v. Thomson & Thomson*, 792 F. Supp. 305 (S.D.N.Y. 1992) .................... | 39 |
| *Cullen v. N.Y. State Civil Serv. Com.*, 435 F. Supp. 546 (E.D.N.Y.), *appeal dismissed*, 566 F.2d 846 (2d Cir. 1977).................... | 16 n.15 |
| *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010).................... | 12 n.13 |
| *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394 (S.D.N.Y. 2008).................... | 32 |
| *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53 (1st Cir. 1999).................... | 37 |
| *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1 (1st Cir. 2004).................... | 20 |

| Cases | Pages |
|---|---|
| *E&L Consulting, Ltd. v. Doman Indus.*,<br>472 F.3d 23 (2d Cir. 2006)........................................................ | 35 |
| *Empire Volkswagen, Inc. v. World-Wide*<br>*Volkswagen Corp.*,<br>627 F. Supp. 1202 (S.D.N.Y. 1986),<br>*aff'd*, 814 F.2d 90 (2d Cir. 1987) ........................................ | 16 |
| *Experian Info. Solutions, Inc. v. Carfax, Inc.*,<br>No. 11-CV-8927 (N.D. Ill. Dec. 16, 2011) ............................. | 11 n.12 |
| *Famous Make Commc'ns Co. v. Suffolk*<br>*County Water Auth.*,<br>No. CV-80-1547, 1981 U.S. Dist.<br>LEXIS 16936 (E.D.N.Y. Sept. 9, 1981) ............................... | 17 |
| *Fisk v. Letterman*,<br>401 F. Supp. 2d 362 (S.D.N.Y. 2005) ................................... | 13 |
| *Foman v. Davis*,<br>371 U.S. 178 (1962)............................................................. | 15 n.15 |
| *FTC v. Cardinal Health, Inc.*,<br>12 F. Supp. 2d 34 (D.D.C. 1998) ........................................ | 37 |
| *Gachette v. Metro N. High Bridge*,<br>No. 12 Civ. 3838 (AJN),<br>2013 U.S. Dist. LEXIS 5396<br>(S.D.N.Y. Jan. 14, 2013)..................................................... | 13 |
| *Geneva Pharms. Tech. Corp. v.*<br>*Barr Labs., Inc.*,<br>386 F.3d 485 (2d Cir. 2004)................................................. | 35, 36 |
| *Halebian v. Berv*,<br>644 F.3d 122 (2d Cir. 2011).................................................. | 12 n.13 |
| *Hassan v. Dr. Kenneth Spicer*,<br>No. 05-CV-1526 (FB) (LB), 2006 U.S. Dist.<br>LEXIS 3571 (E.D.N.Y. Jan. 31, 2006) ................................ | 37 |
| *Hayden v. County of Nassau*,<br>180 F.3d 42 (2d Cir. 1999)................................................. | 12 n.13 |

Cases                                                                              Pages

Hildene Capital Mgmt., LLC v. Friedman,
    Billings, Ramsey Grp., Inc.,
    No. 11 Civ. 5832 (AJN), 2012 U.S. Dist.
    LEXIS 115942 (S.D.N.Y. Aug. 15, 2012) ............................................ 12 n.13, 14

Hudson Valley Asbestos Corp. v.
    Tougher Heating & Plumbing Co.,
    510 F.2d 1140 (2d Cir.), cert. denied,
    421 U.S. 1011 (1975)............................................................................... 17, 19

Innomed Labs, LLC v. ALZA Corp.,
    368 F.3d 148 (2d Cir. 2004)................................................................... 17 n.16, 18,
                                                                                          19

In re "Apollo" Air Passenger Computer
    Reservation Sys.,
    720 F. Supp. 1068 (S.D.N.Y. 1989)........................................................... 26

In re Commodity Exch., Inc., Silver Futures
    & Options Trading Litig.,
    No. 11 Md. 2213 (RPP),
    2012 U.S. Dist. LEXIS 181487
    (S.D.N.Y. Dec. 21, 2012)......................................................................... 21 n.20

Jefferson Parish Hosp. Dist. No. 2 v. Hyde,
    466 U.S. 2 (1984)....................................................................................... 20, 32, 39

Jiaxing Hongyu Knitting Co. v.
    Allison Morgan LLC,
    No. 11 Civ. 09342 (AJN),
    2013 U.S. Dist. LEXIS 2852
    (S.D.N.Y. Jan. 8, 2013)............................................................................ 12 n.13

Joblove v. Barr Labs., Inc.
    (In re Tamoxifen Citrate Antitrust Litig.),
    466 F.3d 187 (2d Cir. 2006).................................................................... 37, 39

Joyce Beverages of N.Y., Inc. v.
    Royal Crown Cola Co.,
    555 F. Supp. 271 (S.D.N.Y. 1983) .......................................................... 20

Juster Assoc. v. Rutland,
    901 F.2d 266 (2d Cir. 1990)..................................................................... 37

Kassner v. 2nd Ave. Delicatessen, Inc.,
    496 F.3d 229 (2d Cir. 2007).................................................................... 14

| Cases | Pages |
|---|---|

*Kaster v. Modification Sys., Inc.,*
731 F.2d 1014 (2d Cir. 1984)............................................................... 15 n.15

*L-7 Designs, Inc. v. Old Navy, LLC,*
647 F.3d 419 (2d Cir. 2011).................................................................. 12 n.13

*La Salle St. Press, Inc. v. McCormick &
Henderson, Inc.,*
293 F. Supp. 1004 (N.D. Ill. 1968) ...................................................... 18

*Leach v. City of N.Y.,*
No. 12 Civ. 2141 (AJN),
2013 U.S. Dist. LEXIS 55722
(S.D.N.Y. April 17, 2013)..................................................................... 14

*Leegin Creative Leather Prods., Inc. v.
PSKS, Inc.,*
551 U.S. 877 (2007)............................................................................. 20

*LePage's Inc. v. 3M,*
324 F.3d 141 (3d Cir. 2003).................................................................. 27 n.27

*Linzer Prods. Corp. v. Sekar,*
499 F. Supp. 2d 540 (S.D.N.Y. 2007)............................................. 17 n.16, 18,
19

*Marion Healthcare LLC v. S. Ill. Healthcare,*
No. 12-CV-00871-DRH-PMF, 2013
U.S. Dist. LEXIS 120722
(S.D. Ill. Aug. 26, 2013) ...................................................................... 18

*Masimo Corp. v. Tyco Health Care Grp. L.P.,*
No. CV 02-4770 MRP, 2006 U.S. Dist.
LEXIS 29977 (C.D. Cal. Mar. 22, 2006)............................................. 22

*Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.,*
475 U.S. 574 (1986)........................................................................... 3, 14, 28

*May Dep't Store v. Graphic Process Co.,*
637 F.2d 1211 (9th Cir. 1980) ............................................................. 17 n.16

*Miksic v. TD Ameritrade Holding Corp.,*
No. 12 Civ. 4446 (AJN),
2013 U.S. Dist. LEXIS 63254
(S.D.N.Y. March 7, 2013)..................................................................... 14

| Cases | Pages |
|---|---|
| *Minnesota Mining and Mfg. Co v.*<br>*Appleton Papers Inc.,*<br>35 F. Supp. 2d 1138 (D. Minn. 1999) ................................................................ | 27 n.26 |
| *NicSand, Inc. v. 3M Co.,*<br>507 F.3d 442 (6th Cir. 2007) ........................................................................ | 24 n.24 |
| *Omega Envtl., Inc. v. Gilbarco, Inc.,*<br>127 F.3d 1157 (9th Cir. 1997) ...................................................................... | 22, 25 n.25,<br>32 |
| *Paddock Publ'ns, Inc. v. Chicago Tribune Co.,*<br>103 F.3d 42 (7th Cir. 1996) .......................................................................... | 23, 24 |
| *PepsiCo, Inc. v. Coca-Cola Co.,*<br>No. 98 Civ. 3282 (LAP)<br>1998 U.S. Dist. LEXIS 13440<br>(S.D.N.Y. Aug. 27, 1998) ............................................................................ | 21 |
| *PepsiCo, Inc. v. Coca-Cola Co.,*<br>114 F. Supp. 2d 243 (S.D.N.Y. 2000),<br>*aff'd,* 315 F.3d 101 (2d Cir. 2002) .............................................................. | 23 n.21 |
| *PepsiCo, Inc. v. Coca-Cola Co.,*<br>315 F.3d 101 (2d Cir. 2002) ........................................................................ | 22 |
| *Pro Search Plus, LLC v.*<br>*VFM Leonardo, Inc.,*<br>No. SACV 12-2102-JLS (ANx),<br>2013 U.S. Dist. LEXIS 169856<br>(C.D. Cal. Dec. 2, 2013) .............................................................................. | 24 n.24 |
| *Pro Search Plus, LLC v.*<br>*VFM Leonardo, Inc.,*<br>No. SACV 12-2102-JST (ANx),<br>2013 U.S. Dist. LEXIS 107895<br>(C.D. Cal. July 30, 2013) ............................................................................ | 18, 19,<br>24 |
| *Roth v. Jennings,*<br>489 F.3d 499 (2d Cir. 2007) ........................................................................ | 12 n.13 |
| *Satellite T Assoc. v. Cont'l*<br>*Cablevision of Va., Inc.,*<br>586 F. Supp. 973 (E.D. Va. 1982),<br>*aff'd,* 714 F.2d 351 (4th Cir. 1983) .............................................................. | 17 |

- viii -

| Cases | Pages |
|---|---|
| *Solent Freight Servs. v. Alberty*,<br>914 F. Supp. 2d 312 (E.D.N.Y. 2012) | 36 |
| *Spectrum Sports, Inc. v. McQuillan*,<br>506 U.S. 447 (1993) | 40 |
| *S.S. Silberblatt, Inc. v. East Harlem Pilot<br>Block-Bldg. 1 Housing Dev. Fund Co.*,<br>608 F.2d 28 (2d Cir. 1979) | 15 n.15 |
| *State Oil Co. v. Khan*,<br>522 U.S. 3 (1997) | 20 |
| *Sterling Merch., Inc. v. Nestle, S.A.*,<br>656 F.3d 112 (1st Cir. 2011) | 20 |
| *Stewart v. Gogo, Inc.*,<br>No. C-12-5164 EMC, 2013 U.S. Dist.<br>LEXIS 51895 (N.D. Cal. April 10, 2013) | 34 |
| *Stop & Shop Supermkt. Co. v. Blue Cross<br>& Blue Shield of R.I.*,<br>373 F.3d 57 (1st Cir. 2004) | 32 |
| *Tampa Elec. Co v. Nashville Coal Co.*,<br>365 U.S. 320 (1961) | 16, 20, 32, 35 |
| *Taylor v. Vt. Dep't of Educ.*,<br>313 F.3d 768 (2d Cir. 2002) | 12 n.13 |
| *Thompson Everett, Inc. v. Nat'l Cable<br>Advert., L.P.*,<br>57 F.3d 1317 (4th Cir. 1995) | 22 |
| *Tops Mkts., Inc. v. Quality Mkts., Inc.*,<br>142 F.3d 90 (2d Cir. 1998) | 36 |
| *Transition Invs., Inc. v. The Allen O.<br>Dragge, Jr. Family Trust*,<br>No. 11 Civ. 04775 (AJN), 2012 U.S. Dist.<br>LEXIS 70777 (S.D.N.Y. May 21, 2012) | 12 n.13, 14 |
| *Tri-State Broad Co. v. United Press Int'l Inc.*,<br>369 F.2d 268 (5th Cir. 1966) | 18 |

| Cases | Pages |
|---|---|
| *Twin City Sportservice, Inc. v.*<br>  *Charles O. Finley & Co.,*<br>  676 F.2d 1291 (9th Cir. 1982) ................................................................ | 36 |
| *United Air Lines, Inc. v. Austin Travel Corp.,*<br>  681 F. Supp. 176 (S.D.N.Y. 1988), *aff'd,*<br>  867 F.2d 737 (2d Cir. 1989). ................................................................ | 26, 30 |
| *U.S. Bank Nat. Ass'n v. Bank of Am., N.A.,*<br>  No. 12 Civ. 4873 (CM), 2012 U.S. Dist.<br>  LEXIS 176157 (S.D.N.Y. Dec. 10, 2012) ................................................ | 13 |
| *U.S. v. Dentsply Int'l, Inc.,*<br>  399 F.3d 181 (3d Cir. 2005).................................................................... | 27 n.27, 39 |
| *U.S. v. Grinnell Corp.,*<br>  384 U.S. 563 (1966)................................................................................ | 39 |
| *Verizon Commc'ns Inc. v. Law Offices of*<br>  *Curtis V. Trinko, LLP,*<br>  540 U.S. 398 (2004) ............................................................................... | 38 |
| *W. Parcel Exp. v. UPS of Am.,*<br>  190 F.3d 974 (9th Cir. 1999) ................................................................. | 22 |
| *Wellnx Life Scis. Inc. v. Iovate*<br>  *Health Scis. Research Inc.,*<br>  516 F. Supp. 2d 270 (S.D.N.Y. 2007)...................................................... | 36 |
| *Winokur v. Office of Court Admin.,*<br>  190 F. Supp. 2d 444 (E.D.N.Y. 2002) .................................................... | 12 n.13 |
| *Woman's Clinic, Inc. v. St. John's Health Sys.,*<br>  252 F. Supp. 2d 857 (W.D. Mo. 2002) ................................................... | 32 |
| *ZF Meritor, LLC v. Eaton Corp.,*<br>  696 F.3d 254 (3d Cir. 2012).................................................................... | 27 n.27, 30 |

**Statutes and Rules**

| | |
|---|---|
| Fed. R. Evid. 201 ..................................................................................... | 21 n.19 |
| 15 U.S.C.A. § 1 (West 2013)..................................................................... | 1, 14, 35 |
| 15 U.S.C.A. § 2 (West 2013)..................................................................... | 1, 40 |

|  | Pages |
|---|---|
| 15 U.S.C.A. § 13 (West 2013) ................................................................... | 19 n.17 |
| 15 U.S.C.A. § 14 (West 2013) ................................................................... | 1, 16 |
| 49 U.S.C.A. §§ 30501-05 (West 2013) ...................................................... | 5 |

Secondar y Sources

| | |
|---|---|
| Phillip E. Areeda and Herbert Hovenkamp,<br>    *Antitrust Law* ¶ 570b1 (4th ed. 2013) ..................................................... | 32 |
| Phillip E. Areeda and Herbert Hovenkamp,<br>    *Antitrust Law* ¶ 760b7 (4th ed. 2013) ..................................................... | 39 |
| Philip E. Areeda and Herbert Hovenkamp,<br>    *Antitrust Law* ¶ 1802g2 (4th ed. 2013) .................................................... | 23 |
| Philip E. Areeda and Herbert Hovenkamp,<br>    *Antitrust Law* ¶ 1821c (4th ed. 2013) ..................................................... | 2, 32 |

Defendant Carfax, Inc. ("Carfax") respectfully submits this brief and accompanying documentation in support of its motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss Plaintiffs' Second Amended Complaint ("SAC").

<u>Preliminary Statement</u>

Vehicle History Reports ("VHRs") analyze and present information about used vehicles on a vehicle-by-vehicle basis. *See* SAC ¶¶ 5, 485, 487, 542, 546(a). Carfax is the oldest provider of VHRs in the country. *See* SAC ¶ 489. It could have chosen to provide the information in its VHRs only to used car dealers. Instead, through innovation and advertising, Carfax has also succeeded in satisfying an unmet consumer need for such information.

Plaintiffs are a number of used car dealers who allegedly purchased VHRs from Carfax. *See* SAC ¶ 480.[1] They complain that the prices they paid for those VHRs are too high because of illegal exclusive dealing under Section 3 of the Clayton Act, 15 U.S.C.A. § 14 (West 2013), Section 1 of the Sherman Act, 15 U.S.C.A. § 1 (West 2013), and Section 2 of the Sherman Act, 15 U.S.C.A. § 2 (West 2013).

Plaintiffs do not assert that their own agreements with Carfax are exclusive, however. They argue instead that they paid too much because of supposedly long-term, exclusive agreements by Carfax with a number of automobile original equipment manufacturers

---

[1] Some entities listed as separate Plaintiffs appear to be the same entity doing business under different names. *See, e.g.,* SAC ¶¶ 25-26, 96-98, 101-02, 106-07, 112-14, 135-37, 175-82, 185-87, 210-11, 235-36, 257-60, 268-70, 278-79, 296-97, 367-68, 380-83, 432-33, 460-61. Others appear to be affiliated entities under common control at the same or nearby locations, *see, e.g.,* SAC ¶¶ 29-30, 38-41, 96-99, 118-19, 135-143, 170-72, 299-300, 315-19, 321-22, 394-95, 397-98, 447-48, or simply under common control at multiple locations, *see, e.g.,* SAC ¶¶ 31-36, 51-53, 55-57, 58-64, 84-85, 83 & 86-87, 173-74, 193-95, 209-11 & 214-17 & 219, 230-32, 238-49, 252-54 (and possibly 251 & 255-56), 264-67, 280-81, 285-87, 293-94, 295, 298 (apparently affiliated with the entity at 296-97), 302-09, 325-36 & 338-44, 349-53, 362-64, 370-75 & 377 (and possibly 376), 400-15 & 417, 418-19, 438-43, 447-50, 460-70, and 474-75.

("OEMs") concerning "Certified Pre-Owned" ("CPO") vehicle programs, and with two websites

hosting classified advertisements for used cars. *See, e.g.,* SAC Preliminary Statement & ¶¶ 502-

03, 509-10, 512-13, 515-17, 520-22, 527, 530-31, 535 (alleging agreements).

 Plaintiffs do not plead facts showing that these agreements involve a

"commodity", so they have no Clayton Act claim. What they allege anyway in all three of their

claims is that agreements between Carfax and OEMs foreclose competition in about 36 percent

of a market measured by the number of VHRs actually sold. *See* SAC ¶ 548; *see also* SAC ¶

560. Even if this percentage were plausible, it would still be insubstantial as a matter of law.

*See, e.g.,* Philip E. Areeda and Herbert Hovenkamp, *Antitrust Law* ¶ 1821c (4th ed. 2013). And,

based on Plaintiffs' other allegations, 36 percent is far too high a percentage to be plausible.

 For example, Plaintiffs assert that "franchised auto dealers" sold 14,989,431 used

cars in 2012. SAC ¶ 514. They also allege that VHRs were "provided" for only approximately

"5,100,000 vehicles" that year. SAC ¶ 514. Even if those "5,100,000 vehicles" were just the

vehicles for which VRHs had been sold to "franchised auto dealers", this would leave those

dealers without VHRs for almost 10,000,000 vehicles. This is so large that it means it cannot be

plausible to define the market solely by vehicles for which VHRs have already been sold.

 Nonetheless, if Carfax did foreclose competition for 36 percent of all VHRs

actually sold in 2012, then, based on Plaintiffs' "5,100,000 vehicles" estimate, this would be

approximately 1,836,000 VHRs. Those 1,836,000 VHRs would address little more than 12

percent of the 14,989,431 "used auto sales by franchised auto dealers" in 2012, SAC ¶ 514, or

4.5 percent of the 40,525,865 used vehicle sales by anyone that year, SAC ¶ 525.

 Plaintiffs' assertions of market foreclosure based on the agreements by Carfax for

two third-party classified advertising websites, Autotrader.com and Cars.com, make equally little

sense. *See* SAC ¶¶ 523-25, 532-34, 549, 561. While Plaintiffs say that "some" of the listings on

those websites might "presumably" be for some of the same used cars, SAC ¶¶ 532-34, they

make no adjustment for this.[2] They also simply assume that if one of these two websites ran a

classified advertisement for a used car with a Carfax VHR, then at no other time that year would

anyone have bought a VHR from another vendor for that same used car. *See* SAC ¶¶ 523-25, 532-

34, 561. This is inherently implausible, particularly given that Experian Information Solutions,

Inc. ("Experian"), doing business as "AutoCheck", *see* SAC ¶¶ 492-94, supplies VHRs "to

about 13,000 franchised and independent used car dealers", SAC ¶ 493, which is over 32

percent of the "40,000 auto dealers" that allegedly advertise on the Autotrader website alone,

SAC ¶ 519. *Cf., e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986) (more required where "the claim is one that simply makes no economic sense").[3]

        Similarly, Plaintiffs identify no separate amount of foreclosure caused by the

supposedly exclusive agreements between Carfax and various OEMS, on the one hand, and

Carfax and the Cars.com website, on the other. The alleged foreclosure of the supposed overall

market is the same "36 percent" for both. SAC ¶¶ 560-61. Only as to Autotrader.com do

Plaintiffs plead a higher overall number—"47 percent." SAC ¶ 561. Nowhere do they ever

explain how these numbers relate to the 90 percent market share number sprinkled throughout

---

[2] Plaintiffs claim that the agreement for Autotrader.com forecloses competition for 75 percent of the VHRs for used cars sold by franchised auto dealers, SAC ¶¶ 523, 561, and the agreement for Cars.com forecloses another 58 percent, SAC ¶¶ 532, 561, which adds up to an impossible 133 percent. And if one website lists a used car with a Carfax VHR, but the other (at any time during the year) lists that same used car with a VHR from another source, Plaintiffs' calculation of the percentage of foreclosure from the first website is wrong.

[3] Plaintiffs assume that at each moment there are typically 3,200,000 used autos listed on Autotrader.com and 2,500,000 on Cars.com, *see* SAC ¶¶ 523-25, 532-34, even though they admit elsewhere that these are, at best, "monthly average[s]", SAC ¶¶ 519, 529, 532-34, 561. The number of listings per month would be much larger than the number at any one moment.

their allegations.  *See* SAC Preliminary Statement & ¶¶ 492, 497, 502, 543, 559, 570, 580, 590. And, just as with Carfax's alleged contracts with OEMs, Plaintiffs' allegations of market foreclosure from agreements involving the Autotrader.com and Cars.com websites are apparently based solely on the number of used vehicles advertised on those sites, *not* on the number of VHRs that could be sold or published for all used vehicles.

Yet even if Plaintiffs had pleaded facts that would make their allegations of market foreclosure at least facially plausible (and had, for purposes of the Clayton Act, alleged a "commodity"), their claims would still fail.  The actual agreements they allege contradict any assertion of exclusion, foreclosure of competition, or use or threatened acquisition of monopoly power.  Almost all those agreements are ██████████████████████████████ ██████ Declaration of Julie A. Ortmeier dated December 13, 2013 ("Ortmeier Dec.") Exs. A-O.

Plaintiffs should know this.  They now admit, for example, that only a few months ago, the owner of the Autotrader.com website terminated its supposedly long-term exclusive agreement with Carfax, replacing it with a "non-exclusive agreement."  SAC ¶ 526. Having seen all of Carfax's other agreements, they should also know that ████████████ ████████████████████████████ SAC ¶¶ 515, 535 (emphasis added), ████████████ ██████████████ In short, the alleged agreements on which Plaintiffs' case rests simply are not the kind recognized by our courts as a basis for an antitrust claim.  This means that Plaintiffs have failed to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

<u>Statement of Facts</u>

Plaintiffs assert a number of facts, beginning with five basic propositions about the relevant product, the relevant markets, and the alleged agreements that supposedly foreclose competition in those markets.  First, they define VHRs as any report containing the information

provided by the National Motor Vehicle Title Information System ("NMVTIS") "established under the Anti-Car Theft Act of 1992, 49 U.S.C. §§ 30501-30505, as amended . . . . ." SAC ¶ 485; *see also* www.vehiclehistorg. ⌐ (last visited Dec. 10, 2013) (cited in SAC ¶ 486)). This includes the "five key indicators of the quality and condition of any used auto or light truck: (1) date of last title and name of state titling agency; (2) "brand" history applied by state titling agency, including "junk", "salvage", and "flood"; (3) odometer reading; (4) total loss history; and (5) salvage history" required by NMVTIS. SAC ¶¶ 485, 542. While a VHR may contain "additional information not required to be included by the NMVTIS", SAC ¶ 487; *see also* SAC ¶ 5, a report still qualifies as a VHR if it contains the "minimum content" required by "federal and state statutes", SAC ¶ 546(a). This seems to mean whatever content NMVTIS requires (because Plaintiffs do not identify any state statute that requires any different content).

Second, Plaintiffs allege a market for this product—the "publication and sale of VHRs", *e.g.*, SAC ¶ 539—and two supposed "submarkets": "the publication and sale of VHRs to franchised auto dealers" and "the publication and sale of VHRs to independent auto dealers", SAC ¶ 479(e), (f). They do not allege any difference in the VHRs sold in those supposed "submarkets." *Cf. Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (valid submarket requires allegations of "such practical indicia as industry or public recognition of the submarket as a *separate* economic entity, the product's *peculiar* characteristics and uses, *unique* production facilities, *distinct* customers, *distinct* prices, sensitivity to price changes, and specialized vendors.") (emphasis added)). Nor do they allege how VHRs are published "to" different dealer groups, as opposed to "published" generally, such as on Autotrader.com and Cars.com.

Third, Plaintiffs allege that the relevant geographic market is "the United States." SAC Preliminary Statement & ¶¶ 479(a), (d)-(f), 495, 497, 502, 514, 523-25, 532-34, 537, 539-

41, 543-44, 546, 549, 559, 561, 569-70, 580-81, 590.  They do not allege any different geographic market for their two supposed product submarkets.

Fourth, they allege that Carfax has "long-term exclusive contracts with 37 of 40 auto manufacturers on their CPO programs."  SAC ¶ 548; *accord* SAC ¶ 479(g); *see also* SAC Preliminary Statement & ¶¶ 509, 513, 538, 553, 555, 560, 569, 571-73, 581-82, 589, 591.[4]  In these agreements, each OEM allegedly requires its dealers to purchase a Carfax VHR for each vehicle the dealer wants to sell through the OEM's CPO program.  SAC Preliminary Statement & ¶¶ 509, 538, 553, 555, 571.[5]

██████████████████████████████████████████████████████████████

Fifth, they allege that Carfax also has "long-term 'partnership' agreement[s]", SAC ¶ 516, with Autotrader.com and Cars.com.  *See* SAC ¶¶ 517, 521, 527, 530.  In those agreements, the two website operators ("the Autotrader Group", which "is a majority owned subsidiary of Cox Enterprises", SAC ¶¶ 517-18, and "Classified Ventures", which is owned by at least five major newspaper chains, SAC ¶¶ 527-28) allegedly promise that if an automobile dealer has purchased a Carfax VHR for a used car, the websites will provide a hyperlink to that

---

[4] Plaintiffs allege that Carfax's agreements are for "37 of 40 Certified Pre-Owned ('CPO') auto sales programs", SAC Preliminary Statement; *accord* SAC 553, 560; or for "37 of about 40 vehicle brands", SAC ¶ 509; *accord* SAC ¶ 538, 571; or for "37 of 40 auto manufacturers", SAC ¶ 548; *accord* SAC 553, 555, 569, 572-73, 581-82, 589, 591.  These are not all the same thing.  *Cf., e.g.,* SAC ¶ 513 (listing 15 manufacturers and 35 brands).

[5] Plaintiffs do not allege that any OEM requires its franchised dealers to purchase only Carfax VHRs, or to purchase any Carfax VHR for any vehicle other than one that will be sold through a CPO program.

VHR, but will not "display or interactively link VHRs from" other suppliers.  SAC ¶ 516.

Absent a Carfax VHR, the "the interactive link to the VHR . . . is empty, and the shopper cannot

access a VHR on the web page displaying the used vehicle."  SAC ¶ 520.  Under "the agreement

entered in 2008 between Carfax and Autotrader" (which is no longer in effect, SAC ¶ 526) this

meant that the website would not have "promotional placements for VHR-related products and

services of . . . any competitor" of Carfax "unless an auto manufacturer requested Autotrader to

do so as part of the manufacturer's CPO program."  SAC ¶ 520.  Supposedly no VHRs of Carfax

competitors therefore "appeared on the Autotrader website."  SAC ¶ 520.  Similarly, on

Cars.com, while an "auto manufacturer" could require that "a VHR of a competitor" of Carfax

be allowed on that site, supposedly "no VHRs of Carfax competitors appeared on the Cars.com

website."  SAC ¶ 529.[6]

███████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

            Plaintiffs surround these five basic assertions with numerous other allegations,

some of them conflicting.  For example, despite the supposedly anticompetitive agreements

between Carfax and various OEMs and between Carfax and two websites, Plaintiffs allege that

---

[6] Plaintiffs have no good faith basis for such allegations.  *See, e.g.,* Ortmeier Dec. Ex. X (example of AutoCheck reports from the Cars.com website at http://www.cars.com/ f( sale/searchresults.action?stk[  =U&dIId=44! (last visited Dec. 9, 2013)).

[7] The alleged terms would require Carfax to pay more for less advertising.  This makes no economic sense.  What the website agreements *actually* did was ███████████████████████████████

*See* Ortmeier Dec. Exs. A at § 2.3.4, B at § 3.1.

substantial competition exists in the national market for the sale and publication of VHRs. Experian alone supplies "VHRs . . . to about 13,000 franchised and independent used car dealers, who in turn furnish them to consumers shopping for used cars." SAC ¶ 493.[8]  (Carfax allegedly "supplies VHRs to more than 32,000 franchised and independent used-car dealers." SAC ¶ 490.)

Similarly, Plaintiffs concede that Carfax has a "first mover" status in the market for VHRs and invests heavily in its products and brand. They admit that "Carfax is the oldest and by far the dominant provider of VHRs", SAC ¶ 489, with a powerful "marketing message", SAC ¶ 515(b), a message it communicates through "(a) a nationwide and international sales force of its employees, (b) nationwide and international advertising and media, and (c) an elaborate Internet website (www.carfax.com)", SAC ¶ 6.[9]  Yet Plaintiffs allege no facts indicating that a VHR supplier such as Experian could not also develop a "powerful marketing message" or advertise its VHRs to develop a consumer identity or win contracts with OEMs or third-party websites. Indeed, Experian can do so. Just this past May, the AutoTrader Group, Inc. was convinced to eliminate Carfax's supposed "exclusivity" on the Autotrader.com website and provide a choice of Experian's AutoCheck VHRs as well. See, e.g., SAC ¶ 526.

Plaintiffs' allegations about the market for the "publication and sale of VHRs in the United States", SAC ¶ 539; accord, e.g., SAC ¶¶ 479(a) & (d), 543-44, 546, 559, 569-70, 581, 590, and the supposed submarkets for "publication and sale of VHRs to franchised auto dealers" and "to independent auto dealers", SAC ¶¶ 540-41, accord, e.g., SAC ¶¶ 479(e)-(f),

---

[8] There are also at least eight other "NMVTIS-approved 'data provider companies'" that sell NMVTIS data in VHR form. SAC ¶¶ 486, 488, 496.

[9] While Carfax has "large computerized databases", SAC ¶ 6, and there can be "economies of scale in the collection and assembly of" used vehicle information, SAC ¶ 546(b), Plaintiffs do not actually allege that Carfax has achieved meaningful economies of scale or, perhaps more importantly, that the NMVTIS database, from which any competitor can purchase, does *not* provide those economies of scale to others.

543-44, 546, 559, 569-70, 581, 590, also conflict with their claims. They define everything in terms of used vehicles, asserting that "40,525,865" used vehicles were sold nationwide in 2012, SAC ¶ 525; that "VHRs are provided for approximately 34 percent of used autos sold annually", SAC ¶ 514; that the number of used vehicles for which VHRs were supplied that year was "approximately 5,100,000", SAC ¶ 514; that franchised dealers sold "14,989,431 used vehicles" in 2012, SAC ¶ 514; that "independent dealers" sold "14,015,474 used vehicles" in 2012, SAC ¶ 524; and that "auto manufacturer CPO programs sold 1,834,746 used vehicles in 2012, more than 12 percent of used car sales by franchised dealers", SAC ¶ 560; *accord* SAC ¶ 514.[10]

But these allegations mean that, for example, CPO sales—the only ones as to which Carfax has agreements with OEMs—account for only slightly more than 4.5 percent of used vehicle sales in the country, and only a little more than 6.3 percent of the 29,004,905 used vehicles sold by dealers. They also mean that the vast majority of used vehicles were sold without any VHR at all. And nowhere do Plaintiffs allege any limitation on the ability of VHR vendors to create VHRs for any used vehicle, or deny that more than one VHR may be published or sold in a year per used vehicle. Thus, either the United States market for the publication and sale of VHRs is about the same size as the number of used vehicles sold annually, or it is larger.

Plaintiffs' allegations of supposed market foreclosure based on the number of used vehicles advertised on Autotrader.com and Cars.com, *see* SAC ¶¶ 519, 529, 561, do nothing to contradict this. They are also largely implausible.

For example, Plaintiffs argue that the old Autotrader agreement "blocked Carfax's competitors from . . . VHRs for at least 75 percent of the used vehicles sold by franchised

---

[10] While Plaintiffs do clearly allege that VHRs were provided for only 5,100,000 used vehicles in 2012, that figure is suspiciously close to 34 percent of the used vehicles sold by one or the other categories of dealers, as opposed to 34 percent of all used vehicles sold.

dealers" in 2012.  SAC ¶ 523.  But if franchised dealers sold 14,989,431 used vehicles in 2012,

SAC ¶ 514, this would mean Carfax was the exclusive provider of VHRs on Autotrader.com for

10,792,390 of those used vehicles, more than twice the number of all vehicles for which VHRs

were supposedly provided that year, *see* SAC ¶ 514.  This is impossible.[11]

    Similarly, Plaintiffs' allegations about the Autotrader.com and Cars.com websites

assume that no vehicle is ever advertised by more than one seller in a year, or on more than one

website, and that no dealer that lists any used vehicle on Autotrader.com or Cars.com will buy a

VHR other than from Carfax.  *See* SAC ¶¶ 523-25, 532-34.  Yet they also allege that some

brands of used vehicles are not covered by any agreement between an OEM and Carfax for CPO

sales, SAC ¶ 503, ███████████████████████████████████

███████████████ and that dealers can and do choose whether to buy VHRs *a la carte* or for

a flat monthly fee on an "unlimited" basis, SAC ¶ 499.  Given the number of used vehicles sold

without a VHR, Plaintiffs cannot plausibly claim that a VHR is essential for used vehicle sales.

They also cannot plausibly assume that a dealer must buy a VHR for every used vehicle

advertised on Autotrader.com, or must buy only a Carfax VHR, particularly when almost 94

percent of all used vehicles sold by dealers are *not* sold through a CPO program for which an

OEM might require a VHR, *see* SAC ¶ 514; *see also supra* at 9.  Yet that is exactly what they do

---

[11] Even if the number of used vehicles for which VHRs were sold or published in the
United States in 2012 were assumed to be approximately 13,778,794 (34 percent, SAC ¶ 514, of
the 40,525,865 used cars sold that year, SAC ¶ 525), this would mean that the total number of
used vehicles remaining as to which Carfax would have been the exclusive VHR provider would
be 2,986,404 (13,778,794 minus the alleged 10,792,390 from franchised dealer listings on
Autotrader.com).  But Plaintiffs also allege that Carfax foreclosed competition with respect to
used cars listed by independent dealers on Autotrader.com by being the exclusive provider for
7,495,680 used vehicles, SAC ¶ 524—many more than the remaining total from their other
allegations.  Similar problems arise in Plaintiffs' allegations about Cars.com, which are mere
"extrapolation[s]" from the allegations about Autotrader.com.  *See* SAC ¶¶ 532-34.

claim. And, just as with their allegations about OEMs, nowhere in their supposed "foreclosure" calculations do Plaintiffs address the number of advertisements run each year in the United States for specific used vehicles across all media, despite having defined the market as the market for sale and publication of VHRs generally.

Despite claiming (on the basis of a document that does not support the claim) that Carfax has a "90 percent market share in the sale of VHRs in the United States", SAC ¶¶ 497, 502, *accord* SAC Preliminary Statement & ¶¶ 543, 559, 570, 580, 590, Plaintiffs do not allege that Carfax has any direct power over Plaintiffs or other dealers.[12] It may have agreements with OEMs that "sponsor[] CPO . . . vehicle sales programs", SAC ¶ 503; *accord* SAC ¶¶ 479(g), 480, but it is those OEMs, not Carfax, that "require dealers participating in CPO programs to purchase Carfax VHRs and supply them to" consumers shopping for a CPO vehicle, SAC ¶ 509. The same is true as to Autotrader.com and Cars.com. The owners of those websites, not Carfax, choose whether to provide a "display or interactive[] link" to VHRs. SAC ¶ 516. As Plaintiffs concede, AutoTrader.com, Inc. has recently demonstrated, by "enabling auto dealers to utilize

---

[12] Plaintiffs' "90 percent" allegations are based solely on a letter from a Carfax salesman attached as "Exhibit C to the Complaint, in *Experian Info. Solutions, Inc. v. Carfax, Inc.* (No. 11-CV-8927, N.D. Ill., filed on Dec. 16, 2011)." SAC ¶ 492; *accord* Ortmeier Dec. Ex. Q. The letter supposedly "claims a nation-wide market share of 90 percent in VHRs." SAC ¶ 492. But it actually states only that Carfax has a 90 percent share of Subaru dealers in the Subaru CPO program and that "JD Power estimates that Carfax's market share is 90 percent . . . ." Ortmeier Dec. Ex. Q at 3-4, 10. The "JD Power estimate[]" to which the letter refers (incorporated by reference here as well, as a result) states that 12 percent of used vehicle buyers read "Online Classifieds" that led to a "used vehicle purchase" in 2005. Ortmeier Dec. Ex. R at 3. Of that 12 percent, 34 percent obtained a VHR before buying. Ortmeier Dec. Ex. R at 8. Of that 34 percent of 12 percent, Carfax had an 89 percent share in 2005. Ortmeier Dec. Ex. R at 8. So JD Powers' actual estimate was that 89 percent of 34 percent of 12 percent (*i.e.*, less than 4 percent) of on-line shoppers also obtained a Carfax VHR before buying. This contradicts Plaintiffs' allegations of an overall "90 percent market share," leaving no plausible allegation of market share at all.

AutoCheck VHRs when merchandising their used car inventory on Autotrader.com", that it, not Carfax, controls this issue.  SAC ¶ 526.

Finally, Carfax is providing the Court (to be filed under seal) the most recent written CPO program agreements with each OEM for which it has ever had such an agreement, and its most recent agreements with the owners of Autotrader.com and Cars.com.  *See* Ortmeier Dec. Exs. A-B, S.  These agreements are repeatedly alleged in, and are integral to, the Second Amended Complaint.  *See, e.g.,* SAC Preliminary Statement & ¶¶ 503, 509-10, 512-13, 515-17, 520-22, 527, 529-31, 535, 538, 548-49, 553-56, 558-61, 569, 571-73, 581-82, 589, 591.  They may therefore be received and considered by this Court without converting this motion into one for summary judgment.[13]  Importantly, they also flatly contradict Plaintiff's claims.

For example, with just a few possible exceptions, none of these agreements is "long-term."  ███████████████████████████████████████████ ███████████████████ Ortmeier Dec. Exs. A-O; *see also, e.g., infra* at 22-24 & nn. 22-23. The owner of Autotrader.com, for example, recently cancelled, ██████████████ its prior agreement with Carfax.  *See* Ortmeier Ex. T at letter of May 24, 2013 from Peter Cassat to Joe

---

[13]*See, e.g., Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Hildene Capital Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, No. 11 Civ. 5832 (AJN), 2012 U.S. Dist. LEXIS 115942, at *5-6 (S.D.N.Y. Aug. 5, 2012) (citing *Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011), and *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 234 (2d Cir. 2008)); *Transition Invs., Inc. v. The Allen O. Dragge, Jr. Family Trust*, No. 11 Civ. 04775 (AJN), 2012 U.S. Dist. LEXIS 70777, at *2 (S.D.N.Y. May 21, 2012) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)); *see also Jiaxing Hongyu Knitting Co. v. Allison Morgan LLC*, No. 11 Civ. 09342 (AJN), 2013 U.S. Dist. LEXIS 2852, at *4 (S.D.N.Y. Jan. 8, 2013) (citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011); *Winokur v. Office of Court Admin.*, 190 F. Supp. 2d 444, 452 (E.D.N.Y. 2002); and *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)).

Koenig; Ex. S at 6(a) (notice provision). ███████████████████████████

███████ *See* Ortmeier Dec. Ex. F at letter of October 25, 2013.

As another example, Plaintiffs claim they are "force[d] . . . to purchase Carfax

VHRs for their entire inventory of used vehicles" by Carfax's pricing program if they participate

in an OEM's CPO program. SAC ¶¶ 538, 571; *accord* SAC Preliminary Statement. But the

relevant agreements all permit a dealer to choose between "all you can eat" pricing or "per

VHR" pricing from Carfax. *See* Ortmeier Dec. Exs. C-O; *see also* SAC ¶ 499 (alleging "$16.95

per VHR or a flat monthly fee for an unlimited number of VHRs"). As to some agreements, ███████

███████████████████████████████ None of the agreements contains any provision

that would enable enforcement of its terms by Carfax against any Plaintiff or other dealer. In

short, they not only do not support Plaintiffs' claims; they refute them.

<u>Argument</u>

This Court could grant the current motion solely because the very agreements

upon which Plaintiffs' claims depend contradict the other allegations in the Second Amended

Complaint. It simply "'is not obliged to reconcile plaintiffs['] own pleadings that are

contradicted by other matters asserted or relied upon or incorporated by reference by [the]

plaintiff in drafting the complaint.'" *Gachette v. Metro N. High Bridge*, No. 12 Civ. 3838 (AJN),

2013 U.S. Dist. LEXIS 5396, at *3-4 (S.D.N.Y. Jan. 14, 2013) (quoting *Fisk v. Letterman*, 401

F. Supp. 2d 362, 368 (S.D.N.Y. 2005)); *see also id.* (quoting *U.S. Bank Nat. Ass'n v. Bank of

Am., N.A.*, No. 12 Civ. 4873 (CM), 2012 U.S. Dist. LEXIS 176157, at *7 (S.D.N.Y. Dec. 11,

---

14 ███████████████████████████████████████████████
████████████████████ *See, e.g.*, Ortmeier Dec. Ex. F at § 4. ███████
████████████████████████████████ *See, e.g.*, Ortmeier Dec. Ex. E at Purchase Order and p. 11 of
Carfax Quotation; Ex. H at § 4. ████████████████████████████████

- 13 -

2012), and *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 607 F. Supp. 2d 500, 502 (S.D.N.Y. 2009)). But even if the Second Amended Complaint were not fatally flawed by such contradictions, it still fails to set forth adequately the necessary elements of each separate cause of action.

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), this Court accepts as true all well-pleaded facts. *E.g., Leach v. City of N.Y.*, No. 12 Civ. 2141 (AJN), 2013 U.S. Dist. LEXIS 55722, at *4-5 (S.D.N.Y. April 17, 2013); *Miksic v. TD Ameritrade Holding Corp.*, No. 12 Civ. 4446 (AJN), 2013 U.S. Dist. LEXIS 63254, at *1-2 (S.D.N.Y. March 7, 2013); *see generally, e.g., Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). It also draws from those facts all reasonable inferences in favor of the plaintiff. *E.g., id.* But it cannot simply accept at face value the legal conclusions a plaintiff asserts from those facts.

To the contrary, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *accord, e.g., Hildene Cap. Mgmt.*, 2012 U.S. Dist. LEXIS 115942 at *5; *Transition Invs., Inc.*, 2012 U.S. Dist. LEXIS 70777, at *2; *Leach*, 2013 U.S. Dist. LEXIS 55722, at *4-5. Thus, Plaintiffs must allege facts showing more than just "a sheer possibility that [Carfax] . . . has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). If they fail to plead any of the necessary elements of a claim, or "plead[] facts that are 'merely consistent with' [Carfax's] . . . liability", that claim "'stops short of the line between possibility and plausibility'" and must be dismissed. *Id.* (quoting *Twombly*, 550 U.S. at 557).

This pleading standard arose out of, and is particularly important in, antitrust cases. *See Twombly*, 550 U.S. at 557-60; *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 587. In *Twombly*, for example, the plaintiffs asserted a violation of Section 1 of the Sherman Act, 15

U.S.C.A. § 1.  *See* 550 U.S. at 548, 550.  One element of such a claim is "a contract, combination, or conspiracy" to carry out "anticompetitive conduct."  *Iqbal*, 556 U.S. at 679-80 (quoting *Twombly*, 550 U.S. at 551).  The plaintiffs therefore alleged "that the defendants 'ha[d] entered into a contract, combination or conspiracy to prevent competitive entry . . . and ha[d] agreed not to compete with one another.'"  *Id.*  In support, they referred to facts about competitor conduct and about prices, and "alleged that the defendants' 'parallel course of conduct . . . to prevent competition' and inflate prices was indicative of the unlawful agreement alleged."  *Id.* at 679-80 (quoting *Twombly*, 550 U.S. at 551).

   The majority in *Twombly*, however, held that the "assertion of an unlawful agreement was a 'legal conclusion' and, as such, was not entitled to the assumption of truth."  *Id.* at 680 (quoting *Twombly*, 550 U.S. at 555).  As for the "factual allegation of parallel behavior", while it "was consistent with an unlawful agreement, . . . it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior."  *Id.* at 680 (quoting *Twombly*, 550 U.S. at 567).  The complaint therefore had to be dismissed.  *Twombly*, 550 U.S. at 570.

   The Second Amended Complaint lacks a number of factual allegations necessary for each of Plaintiffs' three claims (claims which are each analyzed almost entirely the same way).  Many of the allegations it does include fail to satisfy *Twombly* and *Iqbal*.  So even if Plaintiffs' allegations were not completely inconsistent with the terms of the actual agreements at issue, the Second Amended Complaint still should be dismissed without leave to replead.[15]

---

[15] Plaintiffs have had months to review the actual agreements at issue and still cannot state a claim.  A third chance to amend would therefore "not serve any purpose . . . ."  *Kaster v. Modification Sys., Inc.*, 731 F.2d 1014, 1018 (2d Cir. 1984) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962), and *S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Bldg. 1 Housing Dev. Fund*

POINT I

PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 3 OF THE

CLAYTON ACT

To state a claim for illegal exclusive dealing under Section 3 of the Clayton Act, a plaintiff must allege facts which, if true, "plausibly suggest" each of three elements: First, a relevant product and geographic market for a "commodity"; second, an exclusive agreement with respect to dealing in that market; and, third, that the competition foreclosed by the challenged agreement constitutes a substantial share of that market. *E.g., Tampa Elec. Co v. Nashville Coal Co.*, 365 U.S. 320, 327-29 (1961); *Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.*, 627 F. Supp. 1202, 1206 (S.D.N.Y. 1986), *aff'd*, 814 F.2d 90, 97-98 (2d Cir. 1987); *see also, e.g., Comm. Data Servers, Inc. v. IBM*, No. 00 Civ. 5008 (CM), 2002 U.S. Dist. LEXIS 5600, at *10-21 (S.D.N.Y. Mar. 15, 2002). The Amended Complaint fails all these requirements, each of which (other than the existence of a commodity) also applies to Plaintiffs' Sherman Act claims.

      A.    *Plaintiffs Have Not Adequately Pleaded a Relevant Product and Geographic Market for a Commodity.*

Plaintiffs allege that the geographic and product market in this case is the "publication and sale of VHRs in the United States." *E.g.*, SAC ¶ 539. But a Clayton Act claim also requires that the market be for a "commodity," that is, for a good rather than a service. 15 U.S.C.A. § 14. The Second Amended Complaint does not use that word anywhere. Nor does it allege facts that would plausibly show that a VHR is a "commodity."[16]

---

*Co.*, 608 F.2d 28, 42 (2d Cir. 1979)); *see also, e.g., Cullen v. N.Y. State Civil Serv. Com.*, 435 F. Supp. 546, 554 (E.D.N.Y.) (citing cases), *appeal dismissed*, 566 F.2d 846 (2d Cir. 1977).

    [16] The Robinson-Patman Act also has a "commodities" limitation to its reach. *See* 15 U.S.C.A. § 13(a) (West 2013). In that context, "[c]ourts have strictly construed this term,

Each Plaintiff supposedly contracted to purchase VHRs "pursuant to printed standard form contracts supplied to them by Carfax." SAC ¶ 480. Those contracts, called the "Carfax VHS Terms and Conditions", grant each dealer "a limited, nontransferable and nonexclusive license to access and use the CARFAX 'Vehicle History Service' database ('VHS')." Ortmeier Dec. Ex. P ¶ 2. The dealer agrees "that the VHS and all intellectual property relating thereto are and will remain the property of CARFAX." Ortmeier Dec. Ex. P ¶ 2. While the VHS license permits the dealer to run reports which may be physical in nature, and while the payment for VHS access may in part be per report, the structure of the arrangement is clearly that of a service, exactly as the name "Vehicle History *Service*" indicates.

"It is, of course, well settled that section 3 [of the Clayton Act] does not apply to sales of services." *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*, 510 F.2d 1140, 1145 (2d Cir.), *cert. denied*, 421 U.S. 1011 (1975); *accord, e.g., Marion Healthcare LLC v. S. Ill. Healthcare*, No. 12-CV-00871-DRH-PMF, 2013 U.S. Dist. LEXIS 120722, at *15-22 (S.D. Ill. Aug. 26, 2013) (dismissing with prejudice), *and cases cited therein; Satellite T Assoc. v. Cont'l Cablevision of Va., Inc.*, 586 F. Supp. 973, 975 (E.D. Va. 1982), *aff'd*, 714 F.2d 351 (4th Cir. 1983); *Famous Make Commc'ns Co. v. Suffolk County Water Auth.*, No. CV-80-1547, 1981 U.S. Dist. LEXIS 16936, at *10 (E.D.N.Y. Sept. 9, 1981). Plaintiffs may therefore argue that VHRs are a combination of a good and service. But the Clayton Act applies only if the "dominant nature" or purpose of a contract is the sale of tangible products, rather than intangible

---

holding that it denotes only 'tangible products of trade.'" *Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 156 (2d Cir. 2004) (quoting *May Dep't Store v. Graphic Process Co.*, 637 F.2d 1211, 1214 (9th Cir. 1980) (citing *Baum v. Investors Diversified Servs. Inc.*, 409 F.2d 872, 874-75 (7th Cir. 1969)); *see also Ambook Enters. v. Time Inc.*, 612 F.2d 604, 609-10 (2d Cir. 1979) (sale of retail newspaper advertising not "commodities"). As the use of the term "commodity" is the same in both statutes, this Court should "strictly construe[]" its use here under the Clayton Act. *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 556 & n.87 (S.D.N.Y. 2007).

rights or services. *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 556 (S.D.N.Y. 2007) (quoting *Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 156 (2d Cir. 2004) (citing *Tri-State Broad. Co. v. United Press Int'l Inc.*, 369 F.2d 268, 270 (5th Cir. 1966)). *See also, e.g., Marion Healthcare LLC*, 2013 U.S. Dist. LEXIS 120722, at *18-22, *and cases cited therein.*

       In *Linzer*, for example, the defendant patented a process for making paint rollers. 499 F. Supp. 2d at 542. He licensed it to the plaintiff, and sold the plaintiff two machines that used the patented process as well. *Id.* at 542, 556. When a dispute arose about how the plaintiff was manufacturing its rollers, the defendant threatened to sue under the patents, and the plaintiff preempted him by filing a complaint on a variety of grounds, including Section 3 of the Clayton Act. *Id.* at 542-43.

       The court held that Section 3 of the Clayton Act did not apply. Despite the sale of the two machines, "it is beyond cavil" that the "dominant purpose of" the parties' arrangements was a license of intellectual property rights. *Id.* at 556. The court reached this conclusion largely because the plaintiff had paid $11 million in license fees and only $150,000 for the machines. *Id.* But even if the machines had been the starting point for the analysis, "contracts that explicitly grant a license to exploit the intellectual property contained in a commodity have been viewed as primarily concerned with intangible rights, and are therefore not covered by the Act." *Id.* (quoting *Innomed Labs*, 368 F.3d at 161 n.4 (citing *La Salle St. Press, Inc. v. McCormick & Henderson, Inc.*, 293 F. Supp. 1004, 1006 (N.D. Ill. 1968)).

       Similarly, in *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. SACV 12-2102-JST (ANx), 2013 U.S. Dist. LEXIS 107895, at *1-2 (C.D. Cal. July 30, 2013), the plaintiff and defendant each managed and distributed digital images and "rich media" content for hotel and travel websites, much as Carfax distributes content about used cars. The plaintiff claimed that to

"advertise or distribute visual and rich content through an online travel agency" required using one of five intermediary companies. *Id.* at *2. The defendant, however, had allegedly entered into long-term, exclusive dealing contracts with all five of those companies, leaving the plaintiff with no way to compete. *Id.* at *2-3. The plaintiff therefore sued, claiming (among other things) a violation of Section 3 of the Clayton Act. *Id.* at *3.

The defendant in *Pro Search Plus* moved to dismiss. *Id.* at *1. It provided the court with the contracts to which the plaintiff had referred in its complaint, *id.* at *5-8 & n.2, and pointed out that the plaintiff had not alleged a proper "commodity" in connection with them, *id.* at *14-15. The court agreed, and dismissed the plaintiff's claim under Section 3 of the Clayton Act. *Id.* at *16. It noted (citing *Hudson Valley Asbestos Corp.*, 510 F.2d at 1145), that "[b]y its plain language, § 3 [of the Clayton Act] applies only to agreements for tangible goods or commodities." 2013 U.S. Dist. LEXIS 107895, at *15. Clearly distribution of digital images and content about travel did not fall within that definition.[17] Distribution of digital content about used cars is certainly no different. As *Pro Search Plus* and *Linzer* therefore strongly indicate, distribution of VHRs is a service, not a commodity, under the Clayton Act.[18]

---

[17] Similarly, while Plaintiffs allege that a Carfax digital VHR is "readily accessible for distribution in printed form" because it is presented "in .pdf format", SAC ¶ 6, nowhere do they assert that Carfax provides any VHRs in a physical form. Digital distribution of information does not become a "good" just because someone may choose to print the information.

[18] The plaintiff in *Pro Search Plus* later filed a second amended complaint with different allegations and no Clayton Act claim. *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. SACV 12-2102-JLS (ANx), 2013 U.S. Dist. LEXIS 169856, *1, 7 (C.D. Cal. Dec. 2, 2013). Two of its Sherman Act claims survived a motion to dismiss because the defendant did "not dispute that it maintains monopoly power", *id.* at *24, and the plaintiff alleged facts showing that the agreements at issue actually were not open for rebidding, that the defendant had acquired or made agreements with all its competitors, and that it had recently "coerced" a customer to deal exclusively with it, *id.* at *16-17. Here, in contrast, Plaintiffs' own allegations show that agreements are open for rebidding, *see, e.g.*, SAC ¶ 526; they do not allege that Carfax has acquired or contracted with any other VHR providers; and the most recent customer actions

B.      *Plaintiffs Have Not Adequately Pleaded Any Exclusive Agreement that by Its Terms Could Harm Competition.*

Other than the "commodity" requirement, courts analyze Clayton Act Section 3 exclusive dealing claims chiefly by applying the "rule of reason." *See, e.g., Tampa Elec. Co., 365* U.S. at 327; *Sterling Merch., Inc. v. Nestle, S.A.,* 656 F.3d 112, 123 (1st Cir. 2011); *CDC Techs., Inc. v. IDEXX Lab., Inc.,* 186 F.3d 74, 80 (2d Cir. 1999). This means asking whether the allegedly illegal practice "imposes an unreasonable restraint on competition, taking into account a variety of factors." *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997); *accord, e.g., Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 886 (2007) ("the rule [of reason] distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.").

Under the rule of reason, an exclusive dealing agreement is not itself an antitrust violation. *See, e.g., Joyce Beverages of N.Y., Inc. v. Royal Crown Cola Co.,* 555 F. Supp. 271, 277-78 (S.D.N.Y. 1983). In fact, such agreements are "presumptively legal." *CDC Techs.,* 186 F.3d at 80 (internal citations omitted). This is because exclusive dealing "may be substantially procompetitive by ensuring stable markets and encouraging long-term, mutually advantageous business relationships." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 45 (1984) (O'Connor, J., concurring); *accord, e.g., E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.,* 357 F.3d 1, 8 (1st Cir. 2004) ("it is widely recognized that in many circumstances [exclusive dealing agreements] may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like—and pose no competitive threat at all").

--------

demonstrate the opposite of coercion by Carfax, *see* SAC ¶ 526 (website owner terminating agreement with Carfax); Ortmeier Dec. Ex. F at Letter of October 23, 2013 ▬▬▬▬▬▬▬

- 20 -

All the CPO program agreements between Carfax and OEMs have such pro-competitive characteristics. All of them, for example, assure price stability (indeed, price discounts) for the OEMs and their dealers. *See* Ortmeier Dec. Exs. C-O.[19] The same is true of the old agreement for the Autotrader.com website and the current agreement for the Cars.com website, where ██████████████████████████████████ *See* Ortmeier Dec. Exs. A-B. But whatever the pro-competitive features of an agreement, if a plaintiff is trying to allege a claim of illegal exclusive dealing, it must at least allege facts that plausibly support the proposition that such an agreement can actually achieve exclusivity and harm competition. The alleged agreements in this case do not come close to meeting that test.

First, there are no written CPO agreements between Carfax and OEMs for many brands. Plaintiffs may allege that Carfax has "long-term" agreements for the CPO programs of BMW, Buick, Chevrolet, General Motors, Hummer, Lamborghini, Mercedes-Benz, MINI, Oldsmobile, Pontiac, and Saturn brands, *see, e.g.,* SAC ¶ 513, but Carfax has produced all its current written agreements for CPO programs and there are none in effect for these brands.[20]

---

[19] The specific price and duration terms of each agreement appear at various different places in the Exhibits Carfax is filing under seal. *See* Ortmeier Dec. Ex. C at 5 §§ 4.1-4.2; Ex. D at Addendum Four to Marketing and Subscription Agreement for Certified Used Vehicle Program at 1 ¶ 3; Ex. E at Carfax Vehicle History Reports Request for Quote 30 July 2012, at 11; Ex. F at First Amendment to Marketing and Subscription Agreement for Certified Pre-Owned Vehicle Programs at 3 ¶ 14; Ex. G at Exhibit B Schedule of Compensation, at 1 §§ 4.2-4.3; Ex. H at 4 § 4; Ex. I at Addendum and Revival to Marketing and Subscription Agreement for Certified Pre-Owned Program at 1 ¶ 1; Ex. J at Statement of Work Certified Pre-Owned Programs Vehicle History for CPO Dealers at 4 § 4.1; Ex. K at 4 § 4.2; Ex. L at 4-5 §§ 4.1-4.2, 4.5; Ex. M at 4 §§ 4.1-4.2, 4.5; Ex. N at 4-5 §§ 4.1-4.2, 4.5, and Addendum #4 to Marketing and Subscription Agreement for Certified Used Vehicle Program ¶ B; Ex. O at §§ 5.1-5.2, 10.1.

[20] The Court may take judicial notice that these brands necessarily comprise a very large part of the used car market. *See, e.g., In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, No. 11 Md. 2213 (RPP), 2012 U.S. Dist. LEXIS 181487, *56 n.8 (S.D.N.Y. Dec. 21, 2012) (judicial notice appropriate where fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned") (quoting Fed. R. Evid. 201(b)(2)).

Second, the CPO agreement with one of the largest ██████████████████
█████████████████████████████████████████████████████████████████████
████████████████████████████████████ *See, e.g.*, Ortmeier Dec. Ex. E at

Carfax Vehicle History Reports Request for Quote 30 July 2012, p. 10.

Third, courts consistently hold that contracts that are of a relatively short duration

or are terminable at will are not anticompetitive as a matter of law. *See PepsiCo, Inc. v. Coca-*

*Cola Co.*, 315 F.3d 101, 111 (2d Cir. 2002) ("Coca-Cola's exclusive distributorships are short in

duration and terminable at will, and PepsiCo has failed to demonstrate any significant

anticompetitive effect on the price or output of fountain syrup."); *CDC Techs.*, 186 F.3d at 75,

*aff'g, CDC Techs., Inc. v. IDEXX Lab., Inc.*, 7 F. Supp. 2d 119, 122 (D. Conn. 1998) (no anti-

competitive effects where exclusive contracts were "short in duration and easily terminable");

*W. Parcel Exp. v. UPS of Am.*, 190 F.3d 974, 975-76 (9th Cir. 1999) (similar); *Omega Envtl.,*

*Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163-64 (9th Cir. 1997) (agreement with one-year term not

anticompetitive); *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1326 (4th

Cir. 1995) (exclusive contracts "of short duration, usually terminable after a year" not unlawful);

*Masimo Corp. v. Tyco Health Care Grp. L.P.*, No. CV 02-4770 MRP, 2006 U.S. Dist. LEXIS

29977, *16 (C.D. Cal. Mar. 22, 2006) ("exclusive dealing arrangements that are terminable on

short notice are not anticompetitive because foreclosure is very unlikely").[21]

---

[21] In the *PepsiCo* case, the Second Circuit upheld summary judgment in favor of Coca-Cola under circumstances where the challenged exclusionary conduct was far more extensive than Carfax's policies here:

> Coca-Cola's agreements . . . provide[] that distributors who supply customers with Coca-Cola may not "handle[] the soft drink products of [PepsiCo]." . . . [D]istributors who breach the loyalty policy risk termination by Coca-Cola. . . . Thus, a distributor . . . can supply all its customers with either Pepsi or Coke, not both. . . . ("You either live in a red world [Coke] or a blue world [Pepsi] . . . . You can't live in both worlds.") Because

Only four of the agreements at issue ██████████████████████

███████████████████████████████████ The current CPO

agreement with part of one large OEM ███████████████ *see* Ortmeier Dec. Ex. N at

Addendum 4 to Marketing and Subscription Agreement for Certified Used Vehicle Program,

¶ A, ████████████████████████ An agreement with a slightly smaller OEM

██████████████████████████████████████████████████

██████ *See* Ortmeier Dec. Ex. J §§ 8.1, 8.3. The owners of Cars.com ███████████████

██████████████████████ *See* Ortmeier Dec. Ex. B at Amendment of October 25,

█013. Finally, the new agreement negotiated by AutoTrader.com, Inc. ███████████████
2
██████—but, as Plaintiffs concede, *see* SAC ¶ 526, it is clearly non-exclusive.

None of the other agreements has ████████████████████████

██████████████████████████████████████████████████

████████████ *See* Ortmeier Dec. Exs. B-I, K-M, O.[22]  As a result, the agreements here

can hardly be deemed "exclusive" given that, on little or no notice, Carfax could (to the extent it

---

distributors are given an all or nothing choice, a customer of a distributor subject to Coca-Cola's loyalty policy who wants Pepsi will have to go elsewhere to get it.

*PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 245-46 (S.D.N.Y. 2000) (internal record citations omitted), *aff'd*, 315 F.3d 101, 111 (2d Cir. 2002).

[22] For specific references to the termination provisions of the written OEM agreements, *see* Ortmeier Dec. Ex. C § 9 ████████, Ex. D at Addendum Four to Marketing and Subscription Agreement for Certified Used Vehicle Program ¶ 4 ██████████████
██████ Ex. E § 24; Ex. F at First Amendment to Marketing and Subscription Agreement for Certified Pre-Owned Vehicle Programs ¶ 15 ███████████ & Letter of October 23, 2013 ███████████████ Ex. G § 7.6 ████████ ; Ex. H § 9.1 ████████████████ Ex. I at Addendum and Revival to Marketing and Subscription Agreement for Certified Pre-Owned Program ¶ 2 ████████████████ Ex. J at Professional Services Agreement § 8.3 ████████████████████ Ex. K § 9 ████████ Ex. L § 9 ████████████████████ Ex. M at First Amendment to Marketing and Sub cription Agreement ¶ 1 ████ Ex. O § 10.1 ████████████████████ s

- 23 -

has any exclusivity) easily be replaced as a preferred VHR provider.[23]

   This does not mean that Carfax cannot pursue contracts with exclusivity for some period.  This is "[c]ompetition-for-the-contract", and is "a form of competition that antitrust laws *protect* rather than proscribe, and it is common." *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996) (emphasis added); *accord, e.g.*, Areeda & Hovenkamp, *supra*, at ¶ 1802g2 ("Even an exclusive-dealing contract covering a dominant share of a relevant market need have no adverse consequences if the contract is let out for frequent bidding."); *see also, e.g., Balakaw v. Lovell*, 14 F.3d 793, 795 (2d Cir. 1994).  The example in *Paddock Publications* is squarely on point here:  "Every year or two, General Motors, Ford, and Chrysler invite tire manufacturers to bid for exclusive rights to have their tires used in the manufacturers' cars. Exclusive contracts make the market hard to enter in mid-year but cannot stifle competition over the longer run . . . ."  103 F.3d at 45.[24]

   Clearly OEMs have pursued a strategy with respect to VHR providers similar to their strategy with respect to tire manufacturers, as the terms of any existing agreements with

---

[23] In fact, this is exactly what has happened with the Autotrader.com website.  *See* Ortmeier Dec. Ex. T at letter of May 24, 2013 from Peter Cassat to Joe Koenig (at Autotrader.com, Inc.); *see also, e.g.*, ▌▌▌http ://▌ress.Autotrader.com/2013-05-23-AutoTra-Partners-With-Er▌erian-Automotive-To-Enable-Dealers-To-Provide-AutoCheck-Veh▌ Histo▌-R▌orts-On-Their-AutoTrader-com-L▌t(last visited Dec. 17, 2013).  The new agreement with Autotrader.com, Inc. is certainly not "exclusive." ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

[24] There is nothing wrong with an agreement of a few years in this context.  As the Sixth Circuit held in the *NicSand* case, rejecting challenges to a multi-year exclusive dealing agreement for sandpaper, "[f]rom the perspective of a supplier, multi-year agreements ease an aspiring entrant's ability to clear existing market barriers" and recoup its initial investment over time.  *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 453 (6th Cir. 2007).  *See also Pro Search Plus, LLC*, 2013 U.S. Dist. LEXIS 107895, at *6-14 (reviewing alleged exclusive dealing agreements ranging in term from two to five years, but terminable on notice ranging from 30 days to one year, and dismissing all claims).

Carfax indicate. And clearly Carfax has to compete to gain such OEM contracts by, for example, lowering the prices for OEMs, *see, e.g.,* SAC ¶ 511 (Carfax forced to compete for Subaru account)—including, depending on the OEM, negotiation by the OEM to lower or cap prices chargeable to dealers—or, as to website contracts, by potentially paying website providers.

In short, this Court can and should consider on a motion to dismiss the actual agreements alleged by Plaintiffs. *See, e.g., Chambers,* 282 F.3d at 153-54. Almost all of those current agreements are terminable at will on relatively short notice by the website provider or OEM. This means that competitors have regular opportunities to compete for such contracts. They are therefore non-exclusive for antitrust purposes. *See, e.g., PepsiCo,* 315 F.3d at111; *CDC Techs.,* 186 F.3d at 75-76, 80-81. It also means that Plaintiffs have not, and cannot, allege that the agreements plausibly support a claim of exclusive dealing that harms competition.[25]

C.   *Plaintiffs Cannot Cure the Deficiencies in their Claims with Arguments About "De Facto Exclusivity."*

Many of the agreements here ███████████ and ████████████ ██████████ *See, e.g., supra* n.22. Plaintiffs nonetheless allege that they████████ █████████████████████████████████████████SAC ¶¶ 515, 535. But because Plaintiffs know this is not true, they also argue that, despite their *actual* terms, the agreements should be deemed "de facto long-term [and] exclusive" anyway. SAC ¶¶ 515, 535.

_____

[25] Because consumers are end-users of VHRs purchased by dealers and advertised on Autotrader.com and Cars.com, *see, e.g.,* SAC ¶¶ 493, 509, 529, 538, 571, and Plaintiffs do not allege that competitors cannot sell directly to consumers, it not clear whether *any* of these agreements with middlemen matter at all. "If competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether [exclusive dealing] . . . restrictions foreclose from competition *any* part of the relevant market." *Omega Envtl., Inc.,* 127 F.3d at 1163 (citations omitted) (emphasis in original).

The occasional theory of "de facto exclusivity" is little more than a different name for the "practical effect" test from the Supreme Court's 1961 *Tampa Electric Company* decision reversing judgment against an electric company that had an exclusive dealing contract. There the Court simply asked whether the "practical effect" of an agreement was "to prevent a lessee or buyer from using the products of a competitor of the lessor or seller." 365 U.S. at 326-27; *see, e.g., Am. Express Travel Related Servs. Co. v. Visa U.S.A.*, No. 04 Civ. 8967 (BSJ), 2005 U.S. Dist. LEXIS 42852, *19-24 (S.D.N.Y. 2005) (applying theory); *United Air Lines, Inc. v. Austin Travel Corp.*, 681 F. Supp. 176, 184 (S.D.N.Y. 1988) (finding insufficient indicia of de facto exclusive dealing), *aff'd*, 867 F.2d 737 (2d Cir. 1989); *see also In re "Apollo" Air Passenger Computer Reservation Sys.* 720 F. Supp. 1068, 1074-75 (S.D.N.Y. 1989) ("in determining whether a contract violates § 3, a court must consider the practical effect of the challenged arrangements", but agreeing with *United Airlines, Inc.*); *cf. Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1058-60 (8th Cir. 2000) (some claims of "de facto exclusive dealing may be viable", but not in that case).

A few courts in this Circuit have cited de facto exclusive dealing to avoid deciding in favor of a defendant with allegedly exclusive agreements that are not long-term, or that permit termination. But the circumstances of those cases are not present here. For example, in *American Express Travel Related Services*, the court declined to dismiss the plaintiffs' exclusive dealing claims, despite an injunction against the defendants which appeared to permit plaintiffs to terminate certain contracts requiring them to issue only one brand of credit card. *See* 2005 U.S. Dist. LEXIS 42852, at *19, 24-25. The court held that, given other allegations by the plaintiffs, "it remains to be seen whether" those contracts "are, in fact, terminable at will." *Id.* at *24. But that question does not exist here. Many of the contracts at issue have already

terminated, *see* Ortmeier Dec. ¶¶ 27-31 & Exs. S-W, or ████████████ Ortmeier Dec.

Ex. F, and Plaintiffs affirmatively allege a termination just months ago by the owner of the

Autotrader.com website, *see* SAC ¶ 526.[26]

        Despite the very limited scope and application of this "de facto exclusivity"

theory, Plaintiffs have added two paragraphs to their Second Amended Complaint (after Carfax

produced the actual agreements with its initial motion to dismiss) claiming its application. *See*

SAC ¶¶ 515, 535.[27]  They point to six supposed facts supporting that theory:  (1) Carfax's market

share, (2) its "marketing message that it has no trustworthy competitors", (3) ████████████

████████████████████████████████████████████ (4) the requirement

_____

[26] The *American Express Travel Related Services* court relied heavily on *Minnesota Mining and Mfg. Co. v. Appleton Papers Inc.*, 35 F. Supp. 2d 1138 (D. Minn. 1999). There, the question was whether wholesale paper contracts, claimed to be terminable at will, "are actually terminable at will." *Id.* at 1144. The plaintiff offered four proofs to the contrary: incentives that tied up inventory for "a period of several years"; costs too high "to switch completely from one brand to another"; "high market share" and a "deeply rooted customer preference" for defendant's brand in the face of declining demand; and an agreement by "major distributors . . . [to] remain loyal to . . . [defendant's product] regardless of competitors' pricing or product innovations." *Id.* at 1144. But here the Second Amended Complaint itself alleges many contracts that have terminated, and the party most recently terminating did so to switch in part to Carfax's allegedly largest competitor. *See* SAC ¶ 526. Nor have Plaintiffs alleged declining demand for VHRs or any horizontal conspiracy among any Carfax distributors.

[27] The Third Circuit is perhaps the jurisdiction most favorably disposed to "de facto foreclosure" arguments. But the circumstances in *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 263-66, 269-70, 275, 282-84 (3d Cir. 2012), *United States v. Dentsply Int'l*, 399 F.3d 181, 184-86, 193-94 (3d Cir. 2005), and *LePage's Inc. v. 3M*, 324 F.3d 141, 144-45, 157-59 (3d Cir. 2003) (*en banc*), are completely unlike those here. In *ZF Meritor*, the defendant was an admitted monopolist, its contracts were for over five years, and *it* could terminate their favorable terms if customers did not buy enough product. 696 F.3d at 264 & n.2, 265, 282-83. None of these facts exist here. In *Dentsply*, the defendant indisputably had a 75 to 80 percent market share and forbade distributors to add products from any competitor. 399 F.3d at 184-86, 193-94. Here, the facts alleged by Plaintiffs do not support a claim of a large market share, *see, e.g.*, *supra* at 9-12 & nn.10-12, and the largest equivalent to a "distributor", the Autotrader.com website, has just added the products of Carfax's chief competitor, *see supra* at 13. Finally, in *LePage's*, it was undisputed that defendant was a monopolist with an over 90 percent market share, and discounts were "all or nothing." 324 F.3d at 144-45, 157-59. Neither is true here.

that ██████████████████████████████████████████████████████

████████████████ (5) that switching to another VHR provider would be "a 'gargantuan task'

requiring more than six years to accomplish", thus creating a huge barrier to entry, and (6) that

Autotrader did not terminate its prior agreement "until after the filing of this lawsuit."  SAC

¶¶ 515, 535.  None of these allegations states facts that "plausibly suggest", *Iqbal*, 556 U.S. at

680 (quoting *Twombly*, 550 U.S. at 567), ████████████████████████████████

████████████████████████████████  SAC ¶¶ 515, 535, the "practical

effect" of Defendant's conduct is to exclude competitors from the market on a long-term basis.

    1. *Carfax's Market Share.*

    The first factor cited by Plaintiffs in support of their de facto exclusive dealing

claim is "Carfax's overwhelming market share", SAC ¶¶ 515, 535, which is supposedly "90

percent", SAC ¶ 543; *see also* SAC ¶¶ 492, 497, 502, 559, 570, 580, 590.  But "the factual

context" alleged elsewhere by Plaintiffs means that this allegation "simply makes no economic

sense." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

    As noted earlier, *see supra* at 11 n.12, the sole source of Plaintiffs' 90 percent

market share allegation is a letter that does not say that.  *See* Ortmeier Dec. Ex. Q; *see also* SAC

¶ 492.  The letter refers, *see* Ortmeier Dec. Q at 3-4, 10, only to Carfax's 90 percent share of

dealers in the Subaru CPO program and to a "JD Power estimate[]" which in turn, *see* Ortmeier

Dec. Ex.R at 3, 8, actually concludes that Carfax has a market share of 89 percent of 34 percent

of 12 percent of used car buyers in 2005, thus totaling less than 4 percent overall, Ortmeier Dec.

Ex. R at 3, 8.  This contradicts Plaintiffs' claim that Carfax has a "ninety percent market share"

in the publication and sale of VHRs.  Plaintiffs' used vehicle sales figures also contradict this

claim, because they indicate that Carfax provided VHRs for only about 4.5 percent of all used

vehicles sold in the country, or 6.3 percent of those sold by dealers. *See supra* at 9.

      2.    *Carfax's Marketing Message.*

Plaintiffs allege that "Carfax's marketing message [is] that it has no trustworthy competitors." SAC ¶¶ 515. They offer no facts to support this. Nor do they allege (because they cannot) that competitors lack the ability to disseminate their own, competing message. For example, NMVTIS has approved no fewer than nine vendors of VHRs (in addition to Carfax) based on NMVTIS data. SAC ¶ 488. Plaintiffs do not allege that the price of this information precludes competition with Carfax, and since Carfax also uses that information, it would not be hard for a competitor to develop a marketing message with respect to the reliability of that data.

      3.    *Cash and Non-Cash Payments.*

Plaintiffs allege that Carfax's ███████████████████ ████████████████████████████████████████████ ██████████████████ SAC ¶¶ 515(c), 535(b); *see also* SAC ¶¶ 510, 557. But Plaintiffs allege no facts plausibly supporting such an opinion. Indeed, their allegations are to the contrary.

For example, Carfax allegedly paid Subaru a total of $215,000 for a three-year exclusivity agreement. SAC ¶ 511. Carfax also allegedly charges $899 to $1 549 for a monthly subscription to its VHS service. SAC ¶ 500. Even at the lower subscription price ████████ ████████████████████████████████████████ Even if Experian charges only half as much for its AutoCheck VHR service, *see* SAC ¶ 501, it certainly could profitably afford to make such a payment. *Cf., e.g., Concord Boat*, 207 F.3d at 1059 ("discounts, because they were significantly above cost, left ample room for new competitors . . . to enter the . . . market").

Furthermore, the OEMs and the internet websites—not Carfax—have the

bargaining power on these issues. As Plaintiffs admit, it is the OEMs, not Carfax, that sponsor the CPO programs, *see* SAC ¶¶ 503, 505, and it is the OEMs, not Carfax, that "require dealers participating in CPO programs to purchase Carfax VHRs," SAC ¶ 509. Similarly, it is the owners of Autotrader.com and Cars.com, not Carfax, that choose whether or not "to display interactive links" to VHRs on their websites. SAC ¶ 516. The owner of Autotrader.com demonstrated this power when it unilaterally terminated its supposedly "long-term" and "exclusive" agreement with Carfax, despite Carfax's alleged cash payments, replacing it with a non-exclusive agreement "enabling auto dealers to utilize AutoCheck VHRs when merchandising their used car inventory on Autotrader.com." SAC ¶ 526.

Finally, even if Carfax had ███████████████████ Plaintiffs allege no way for Carfax to enforce that right. *Cf., e.g., ZF Meritor*, 696 F.3d at 282 (defendant could "terminate the agreements if the market-share targets were not met"). Plaintiffs admit that Carfax's counterparties are the ones with the right to terminate, for example. SAC ¶¶ 515, 535.

       4.    *Website Exclusivity.*

The fourth factor cited by Plaintiffs in support of their de facto exclusive dealing theory is ███████████████████████████████ ████████████████████████████████████████ ███████████████████ SAC ¶ 515(d). Again, these allegations are flatly contradicted by Experian's new agreement "enabling auto dealers to utilize AutoCheck VHRs when merchandising their used car inventory on Autotrader.com." SAC ¶ 526. *See Austin Travel*, 681 F. Supp. at 184 (de facto exclusive dealing claim rejected where the defendant's competitors could obtain similar contracts); *Concord Boat*, 207 F.3d at 1059 (significant that buyers "in fact switched" to competing products). They are similarly contradicted by some of

- 30 -

the OEM agreements. *See, e.g.,* Ortmeier Dec. Ex. E at Carfax Vehicle History Reports Request for Quote 30 July 2012, p. 10 ███████████████████████████████

     5.    *Barriers to Entry.*

Fifth, Plaintiffs allege that "switching" from Carfax to "another VHR provider . . . in a manufacturer's CPO program" would require "more than six years to accomplish", and thus is a huge barrier to entry for any competitor. SAC ¶ 515(e). But this allegation is squarely contradicted by the admission that, despite this supposed barrier, "Nissan and Infiniti", which also have agreements with Carfax, *see* Ortmeier Dec. Ex. J, have "partnered . . . with AutoCheck" anyway, SAC ¶ 515(e) (quoting Experian Exhibit C). A competitor does not need to achieve its own exclusivity to make money, and obviously exclusivity is not essential (even though it may be pro-competitive) for a CPO program, or one of the nation's largest OEMs would not have negotiated to allow some dealers to use a vendor other than Carfax, *see, e.g.,* Ortmeier Dec. Ex. E at Carfax Vehicle History Reports Request for Quote 30 July 2012, p. 10.

     6.    *Post-Complaint Action by Autotrader.*

Finally, Plaintiffs allege that "Autotrader did not exercise its right to terminate its long-term exclusive agreement with Carfax until after the filing of this lawsuit . . . ." SAC ¶ 535. But this does not indicate that Carfax's agreements are "de facto exclusive." It is an admission that the largest agreement (by supposed market foreclosure, *see, e.g.,* SAC ¶¶ 523-25), was not in fact exclusive. Thus none of Plaintiffs' efforts to prove "de facto exclusivity" actually do so.

    D.    *Plaintiffs Have Not Adequately Pleaded Foreclosure of a Substantial Share of the Market.*

There is yet another reason why Plaintiffs' arguments about "de facto exclusive dealing", or exclusive dealing in general, are wrong: "Only those arrangements whose probable

effect is to foreclose competition in a *substantial* share of the line of commerce affected violate

[the antitrust laws]." *Omega Envtl., Inc.*, 127 F.3d at 1162 (internal quotations and citations

omitted) (emphasis added); *accord, e.g., CDC Techs.*, 186 F.3d at 80. A plaintiff must therefore

allege facts plausibly indicating that the competition foreclosed by an exclusive dealing

arrangement amounts to a "substantial share of the relevant market." *Tampa Elec. Co.*, 365 U.S.

at 328. To do so "it is necessary to weigh . . . the proportionate volume of commerce

[foreclosed] in relation to the total volume of commerce in the relevant market area . . . ." *Id.* at

329; *accord, e.g., Omega Envtl., Inc.*, 127 F.3d at 1170; Areeda & Hovenkamp, *supra*, at ¶

570b1; *see also, e.g., Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236-37 (1st Cir.

1983) (courts must consider "the extent of the foreclosure").

   Foreclosure of 35 percent of a market is usually legally insignificant, *Woman's*

*Clinic, Inc. v. St. John's Health Sys.*, 252 F. Supp. 2d 857, 868 (W.D. Mo. 2002), because courts

require a "freeze out" of 30 to 40 percent as the threshold for what is "substantial", *see, e.g., Stop*

*& Shop Supermkt. Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) (citing

*Jefferson Parish Hosp. Dist. No. 2*, 466 U.S. at 45-46 (O'Connor, J., concurring)); *Discover Fin.*

*Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 406 (S.D.N.Y. 2008). Indeed, "foreclosure

percentages of less than 30 or 40 percent in a properly defined market would seem to be

harmless to competition." Areeda & Hovenkamp, *supra*, at ¶ 1821c.

   Here, Plaintiffs claim that the alleged contracts between Carfax and various

OEMs foreclose competition in about 36 percent of a market measured by annual vehicles sold.

*See* SAC ¶¶ 548, 560; *see also* SAC ¶¶ 514, 523-25, 532-34. Even if this were true, it would not

establish substantial foreclosure. And Plaintiffs' own factual allegations actually establish a

percentage of foreclosure with respect to agreements between Carfax and OEMs of more like 4.5

or 6.3 percent. *See supra* at 9 (citing SAC ¶¶ 514, 524-25, 560); *see also supra* at 2 (12 percent if there were really a submarket for "used auto sales by franchised auto dealers").

As for the two websites, Plaintiffs' overall foreclosure figure for the Cars.com website is also a legally insubstantial 36 percent. *See* SAC ¶ 561. Only as to the Autotrader.com website agreement—which they now concede is non-exclusive, *see* SAC ¶ 526—do they allege a foreclosure percentage above 40 percent. *See* SAC ¶ 561. But just as with the OEM agreements, Plaintiffs' own factual allegations show that those percentages are implausibly high. *See supra* at 9-10 (if the old Autotrader agreement foreclosed competition for "75 percent of the used vehicles sold by franchised dealers", SAC ¶ 523, this would mean Carfax was the exclusive provider of VHRs for 10,792,390 of those used vehicles, more than twice the number for which VHRs were allegedly actually provided that year, *see* SAC ¶ 514); *see also supra* at 10 n.11.

As the foregoing indicates, Plaintiffs' highest percentage allegations of foreclosure based on OEM agreements and the Cars.com agreement are, on their face, not sufficient to support a Clayton Act Section 3 claim. And pursuant to the facts they allege, *all* their percentage of foreclosure allegations are actually implausibly high.

Plaintiffs' alleged product and geographic market is "publication and sale of VHRs in the United States." *E.g.,* SAC ¶ 539. They claim separate submarkets for "publication and sale of VHRs . . . in the United States" to "franchised automobile dealers" and to "independent auto dealers", respectively. *E.g.* SAC ¶¶ 540-41. Nowhere do they define these markets and submarkets to be limited to only one VHR per used vehicle per year, or only to the number of VHRs actually sold. Nor do they say anywhere that VHRs are *not* available for any material number of used vehicles. Thus the market for the publication and sale of VHRs must be at least equal in size to the 40,525,865 used vehicles sold in the United States in 2012. SAC ¶ 525. This number dwarfs the number of used vehicles they allege to have been sold with a

- 33 -

VHR or advertised with a VHR on Autotrader.com and Cars.com. Yet they allege percentages of foreclosure only of the number of used vehicles sold or advertised for which VHRs were actually purchased or published, not the larger number for which VHRs could have been sold or published. Those percentages are therefore grossly inflated.

A similar confusion of existing sales and actual markets occurred in *Stewart v. Gogo, Inc.,* No. C-12-5164 EMC, 2013 U.S. Dist. LEXIS 51895 (N.D. Cal. April 10, 2013). There, the plaintiff alleged violations of Sections 1 and 2 of the Sherman Act because of "ten-year exclusive agreements" to provide internet connectivity to passengers in the "market for inflight internet access services on domestic commercial airlines flights." *Id.* at *3, 6. The plaintiffs alleged that 85 percent of the planes equipped for internet access used the defendant's service under those agreements. *Id.* at *3-4. But they failed to allege any facts (such as technological or financial barriers) that would exclude from the market planes not yet equipped for such access. *Id.* at *12. As a result, despite the allegations of 85 percent market share on planes that already had internet connectivity, the plaintiffs had failed to allege substantial foreclosure of the actual market alleged. *Id.* at *12-13.

The same is true here. Plaintiffs do not allege any reason why more than one VHR cannot be sold or published for the same used vehicle within the same year. Nor do they allege that only one advertiser can advertise a particular used car for sale on the Cars.com or Autotrader.com website during a year. In short, their allegations about listings of used cars for sale are not a sufficient substitute for allegations about foreclosure of sales of VHRs. As in *Stewart v. Gogo, Inc.*, this Court should therefore dismiss because "Plaintiffs have failed to allege that, as a result of the exclusive dealing arrangements made . . . there has been substantial foreclosure of competition in the relevant market . . . ." *Id.* at *13.

- 34 -

POINT II

PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 1 OF THE
SHERMAN ACT

To state a claim for an illegal restraint of trade under Section 1 of the Sherman

Act, 15 U.S.C.A. § 1, a plaintiff must allege facts which, if true, would prove two elements:

first, a contract, combination, or conspiracy among two or more persons or distinct business

entities, which, second, unreasonably restrains trade or commerce. *E.g., Twombly*, 550 U.S. at

548-49; *E&L Consulting, Ltd. v. Doman Indus.*, 472 F.3d 23, 29 (2d Cir. 2006); *Geneva Pharm.*

*Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 506 (2d Cir. 2004).[28]  Like a claim under Section 3

of the Clayton Act, this means that the rule of reason applies.  And because Plaintiffs allege the

same facts for purposes of a claim under Section 1 of the Sherman Act as they do under Section

3 of the Clayton Act, *see, e.g.*, SAC ¶ 568, the former claim fails under the rule of reason, just

like the latter.  Indeed, because Section 3 of the Clayton Act is typically considered broader

than Sections 1 and 2 of the Sherman Act, a failure to prove illegal exclusive dealing under

Section 3 of the Clayton Act "ordinarily implies the conclusion that the contract does not violate

the Sherman Act." *CDC Techs.*, 186 F.3d at 79 (citing, e.g., *Tampa Elec. Co.*, 365 U.S. at 335);

*accord, e.g., Comm. Data Servers, Inc. v. IBM*, 262 F. Supp. 2d 50, 77-78 (S.D.N.Y. 2003).

The language used in analyzing exclusive dealing claims under the two statutory

sections is also similar.  For example, "[e]xclusive dealing is an unreasonable restraint of trade

and a § 1 violation only when the agreement freezes out a *significant* fraction of buyers or sellers

---

[28] As with each of the other claims in the Second Amended Complaint, Plaintiffs must
also prove an antitrust injury and damages. *See generally, e.g., Brunswick Corp. v. Pueblo Bowl-
O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
502 F. 3d 91, 105 (2d Cir. 2007).

from the market." *Geneva Pharms. Tech. Corp.*, 386 F.3d at 508 (emphasis added) (citations

omitted). If there is any difference between "significant" in this context and "substantial"

foreclosure of competition under Section 3 of the Clayton Act, it is that "substantial" foreclosure

would require "a *greater* showing of anticompetitive effect", *CDC Techs*, 186 F.3d at 79

(emphasis added) (quoting *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d

1291, 1304 n.9 (9th Cir. 1982)); *accord, e.g., Allied Orthopedic Appliances Inc. v. Tyco Health*

*Care Grp. LP*, 592 F.3d 991, 996 n.1 (9th Cir. 2010). As with "substantial" foreclosure,

Plaintiffs simply have not alleged facts establishing "significant" foreclosure. Nor could they.

     Plaintiffs' allegations of market share or market power, *see, e.g.*, SAC ¶¶ 492,

497, 502, 543, 559, 570, 580, 590, cannot substitute for this lack, either. In *Solent Freight Servs.*

*v. Alberty*, for example, the plaintiff argued that "it could successfully plead a rule of reason

claim by alleging that Defendant possesses market power in the relevant market, as demonstrated

through Omni's 75% control of the market." 914 F. Supp. 2d 312, 323 (E.D.N.Y. 2012)

(citations omitted). But "Plaintiff's allegation that Omni has 75% of the relevant market" was

"not itself a sufficient showing of market power to discharge the requirement that Plaintiff show

harm to the market." *Id.* (citing *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir.

1998), and *Wellnx Life Scis. Inc. v. IovateHealth Scis. Research Inc.*, 516 F. Supp. 2d 270, 294

(S.D.N.Y. 2007)). And while the plaintiff alleged that it was "forced" to use the defendants'

services, there were "four other freight forwarders in the market." *Id.* Thus merely alleging

market power would not prove that the defendant could raise rates without losing business. *Id.*

     As in *Solent Freight*, Plaintiffs here have admitted the existence of other

competitors. Indeed, they affirmatively allege the existence of at least ten of them, *see* SAC ¶

488, and that the largest competitor has a substantial customer base, *see* SAC ¶¶ 493, 495,

515(e), 526. This directly undermines Plaintiffs' arguments that Carfax has created three

supposedly insurmountable "[b]arriers to entry" in the form of:

> (a)   federal and state statutes and rules requiring minimum content of VHRs (e.g., NMVTIS);
>
> (b)   economies of scale in the collection and assembly of vast amounts of information on significant events in the history of each auto or light truck by VIN number; and
>
> (c)   economies of scale in the marketing and provision of service and support to various entities in the auto industry needing to avail themselves of VHRs . . . .

SAC ¶ 546. These three purported "barriers" are not material, in any event.

    First, if there are both federal and state statutes specifying minimum requirements

for VHRs, *see* SAC ¶ 485, they would not be barriers to entry that could support a claim against

Carfax. When a claimed restraint is the consequence of government action, it falls within the

purview of the *Noerr-Pennington* doctrine and cannot serve as a basis for a claim. *E.g., Joblove*

*v. Barr Labs., Inc. (In re Tamoxifen Citrate Antitrust Litig.)*, 466 F.3d 187, 217 (2d Cir. 2006)

(citing *Juster Assoc. v. Rutland*, 901 F.2d 266, 271-72 (2d Cir. 1990)). Furthermore, NMVTIS

standards, *see* SAC ¶ 485, are essentially quality standards, and in "cases that have condemned

quality standards as anticompetitive", the courts look for "a showing that the standard was

deliberately distorted . . . sometimes through lies, bribes, or other improper forms of influence, in

addition to a further showing of market foreclosure." *DM Research, Inc. v. College of Am.*

*Pathologists*, 170 F.3d 53, 57-58 & n.3 (1st Cir. 1999) (citing cases), *quoted in Hassan v. Dr.*

*Kenneth Spicer*, No. 05-CV-1526 (FB) (LB), 2006 U.S. Dist. LEXIS 3571, at *13 (E.D.N.Y.

Jan. 31, 2006). Plaintiffs have alleged no such additional facts here.

    Second (and third) some courts have, in other contexts, recognized economies of

scale as a barrier to entry. *See, e.g., FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 57 (D.D.C.

1998). But here Plaintiffs admit that small competitors do in fact exist. SAC ¶ 496. They allege

no facts that would show that new competitors could not become "NMVTIS-approved vendors of VHRs", SAC ¶ 496, just like those small competitors.  And their attempt to limit the market for this argument to "various entities in the auto industry needing to avail themselves of VHRs", SAC ¶ 546(c), contradicts their allegations elsewhere that consumers are end users of (and therefore natural customers for) VHRs, *see, e.g.,* SAC ¶¶ 493, 509, 529, 538, 571.  Thus Plaintiffs fail to allege facts that would show that scale is necessary for the sale of VHRs.

In short, the agreements at issue here do not support Plaintiffs' claims.  *See, e.g., supra* at 12-13, 21-23.  But even apart from those agreements, Plaintiffs have failed properly to allege substantial market power or foreclosure gained through any anticompetitive means.

POINT III

PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT

To make a claim of alleged exclusive dealing under Section 2 of the Sherman Act, it is not enough simply to plead the existence of a monopoly or monopoly power.  *E.g., Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  A plaintiff must also—just as under Section 3 of the Clayton Act and Section 1 of the Sherman Act—allege facts showing anticompetitive conduct by the defendant.  Both in their claim of monopolization and in their claim of attempted monopolization, Plaintiffs continue to fail this test.

A.  *Plaintiffs Have Failed To State a Claim of Monopolization.*

To state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must allege facts which, if true, would prove two elements:  First, "possession of monopoly power" in the relevant product and geographic market; and, second, the willful acquisition or maintenance of that power by the defendant, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

- 38 -

*Joblove*, 466 F.3d at 202 (citing *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).  In this case, Plaintiffs' claims of monopolization depend on the same allegations of exclusionary conduct by Carfax as their claims under Section 3 of the Clayton Act and Section 1 of the Sherman Act.  *See, e.g.*, SAC ¶ 578.  The relevant analysis is therefore essentially the same. Areeda & Hovenkamp, *supra*, at ¶ 760b7.  This includes a requirement that the "challenged practices bar a substantial number of rivals or severely restrict the market's ambit."  *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005); *see also, e.g., Jefferson Parish*, 466 U.S. at 45 (O'Connor, J., concurring).  As previously shown, however, *see, e.g., supra* at 32-35, Plaintiffs have not alleged facts showing a "substantial" or "severe" restriction of competition.

   In addition, even if Plaintiffs' allegations of monopoly were plausible, their claims would be like those in *Corsearch, Inc. v. Thomson & Thomson*, 792 F. Supp. 305 (S.D.N.Y. 1992).  There the plaintiff sought an injunction to prevent the defendant from terminating access to the defendant's trademark database on the theory that the defendant had monopoly power in the "comprehensive trademark search market."  *Id.* at 306.  As with NMVTIS in the VHR market, there is an inexpensive government-sponsored database for trademarks at the Patent and Trademark Office.  *Id.* at 308.  Like the VHR market, there is also substantial data not in the government-sponsored database.  *Id.* at 309-10.  So when the defendant decided to terminate the plaintiff's access to data—that is, when it decided to engage in exclusive dealing—the court held that, despite evidence of monopoly power, *id.* at 325, the defendant had not violated Section 2 of the Sherman Act, *see id.* at 332.  Not only this conclusion, but much of the court's analysis in *Corsearch* supports the same outcome here.  *See, e.g., id.* at 326-27 (competitor had financial ability to create data base, so not a barrier to entry; defendant's price was the highest, so pricing policy not a barrier to entry).

B.    *Plaintiffs Have Failed To State a Claim of Attempted Monopolization.*

To state a claim of attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C.A. § 2, a plaintiff must allege facts which, if true, would prove four elements: First, a relevant product and geographic market; second, a dangerous probability that the defendant may be able to achieve monopoly power in that market; third, that the defendant is engaged in predatory or anticompetitive conduct; and fourth, that the defendant has a specific intent to monopolize. *E.g., Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 459 (1993).  Once again, however, Plaintiffs have not pleaded, *see, e.g.* SAC ¶ 587, facts showing even an ability to exclude any significant or substantial amount of competition in the national market for the publication and sale of VHRs, much less a dangerous probability that Carfax will succeed in doing so.  Carfax's actual agreements also simply do not support such a conclusion.

<u>Conclusion</u>

For the reasons stated above, this Court should dismiss Plaintiffs' Amended Complaint without leave to replead.

Dated:  December 17, 2013

Respectfully submitted,

NIXON PEABODY LLP

By:    _____
       Christopher M. Mason (CM 7146)

437 Madison Avenue
New York, New York 10022
Telephone:  (212) 940-3000
Facsimile:  (212) 940-3111
cmason@nixonpeabody.com

Attorneys for Defendant
Carfax, Inc.

- 40 -