USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _SEP 2 9 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MAXON HYUNDAI MAZDA, et al.,

> Plaintiffs,

–v–

CARFAX, INC.,

> Defendant.

---

No. 13-cv-2680 (AJN)

REDACTED
MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

Plaintiffs are both franchised and independent car dealerships in the business of selling used cars. With their complaint in this action, they allege that Defendant Carfax, Inc. illegally has entered into exclusive-dealing arrangements for the sale of Vehicle History Reports (VHRs) with both the auto manufacturers who run "Certified Pre-Owned" (CPO) used car programs and with the two largest websites providing classified used car listings, Autotrader.com and Cars.com. According to the Second Amended Complaint (Dkt. No. 56), these agreements violate Section 3 of the Clayton Act (15 U.S.C. § 14) and Sections 1 and 2 of the Sherman Act (15 U.S.C §§ 1 & 2). Defendant has moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the following reasons, Defendant's motion is granted in part and denied in part.

## I.      Background

For the purpose of evaluating Defendant's motion to dismiss, all allegations in the Complaint are taken as true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The Plaintiffs are over 450 car and light truck dealerships who have either purchased VHRs from Defendant as a condition of participating in a CPO program, placed classified listings of used cars on one or both of Autotrader.com and Cars.com, or both. Compl. ¶¶ 8-478, 481. A CPO program offers consumers extended warranties on used cars that have passed an extensive inspection in exchange for premium prices. *Id.* ¶ 504. All major auto manufacturers run CPO programs through their franchised dealerships. *Id.* ¶ 505. The Plaintiff franchised dealerships were required to purchase Defendant's VHRs in conjunction with CPO programs they administered. *Id.* ¶ 481.

According to the complaint, VHRs provide information about the title, flood damage, total loss accident history, odometer readings, lemon history, number of owners, accident indicators, state missions inspection results, service records, and vehicle use to customers shopping for used cars. *Id.* ¶ 5. Defendant prepares VHRs electronically in .pdf format, and the reports can be printed for customers, including at computer work stations at car dealerships. *Id.* ¶¶ 5-6.

Basic information about used vehicles must be reported to a centralized database called the National Motor Vehicle Title Information System (NMVTIS), established by the Anti Car Theft Act of 1992, *codified as amended at* 49 U.S.C. §§ 30501-30505. *Id.* ¶ 485. The database contains information of five quality indicators for used cars: (1) the date of the last title and the name of the state titling agency; (2) "brand" history applied by the state titling agency, such as "junk," "salvage," or "flood"; (3) the odometer reading; (4) total loss history; and (5) salvage history. *Id.* The data in the NMVTIS is made available to dealers and individual consumers through private companies. *Id.* ¶ 486; *Research Vehicle History*, National Motor Vehicle Title

Information System, http://vehiclehistory.gov/nmvtis_vehiclehistory.html (last visited Sept. 26, 2014).

There are ten approved vendors of NMTVIS VHRs. *Id.* ¶ 488. Defendant is the oldest, and supplies VHRs to more than 32,000 franchised and independent used-car dealerships. *Id.* ¶ 489-90. The Complaint claims, based on an exhibit attached to the complaint in another case, that Defendant has a 90% market share nationwide in the sale of VHRs. Compl. ¶ 492; Ortmeier Decl. Ex. Q (Dkt. No. 46-17). For comparison, the complaint claims that one of Defendant's largest competitors, AutoCheck (run by the credit reporting agency Experian) supplies VHRs to about 13,000 franchised and independent auto dealers. *Id.* ¶¶ 493-94. AutoCheck, plaintiffs allege, accounts for 10% of the market share in VHRs, with the other eight providers having negligible shares of the market. *Id.* ¶¶ 495-96.

The Complaint claims that Defendant's VHR prices are significantly higher than those of its competitors. *Id.* ¶ 498. It enters into annual subscription agreements with dealerships, and charges them either per vehicle at a typical rate of $16.95 per VHR, or a monthly flat fee for unlimited VHRs that varies between $899 and $1549 per month based on the average inventory of the dealer. *Id.* ¶¶ 499-500. Unlimited monthly subscriptions for AutoCheck VHRs cost "less than half" the price of Defendant's VHRs, but "relatively few" dealerships purchase them because of Defendant's exclusive-dealing arrangements. *Id.* ¶ 501.

Plaintiffs allege that Defendant acquired and maintains its 90% market share by entering into long-term partnerships that effectively force dealers to purchase Defendant's VHRs instead of its rivals'. *Id.* ¶¶ 497, 502. These agreements can be broken down into two categories. The first type is with auto manufacturers sponsoring CPO programs. *Id.* ¶¶ 503-04. Manufacturers of 37 of the 40 vehicle brands that sponsor CPO programs have entered into agreements with

3

Defendant requiring dealers participating in the program to provide a VHR prepared by Defendant to every consumer shopping for any CPO vehicle. *Id.* ¶ 509. In return, Defendant provides cash or non-cash "marketing support" to manufacturers, at a level no other VHR provider can match. *Id.* ¶ 510. For example, the same document from separate litigation in which Defendants claimed a 90% market share in VHRs also showed that Defendant offered to increase its marketing support to Subaru from $190,000 to at least $215,000 if Subaru agreed to enter into a renewed three-year partnership agreement, rather than entering into an agreement with AutoCheck. *Id.* ¶ 511; Ortmeier Decl. Ex. Q (Dkt. No. 46-17). The upshot of these agreements, Plaintiffs say, is that dealers with CPO programs are required to purchase "overpriced and less reliable Carfax VHRs," even though they would prefer to purchase "competitively-priced and more reliable VHRs from other sources." *Id.* ¶ 512.

CPO programs accounted for over 12% of the total number of used car sales by franchised used car dealers in the United States in 2012. *Id.* ¶ 514. VHRs are provided for approximately 34% of all vehicles sold in the United States. *Id.* Because VHRs are required for all CPO vehicles, Plaintiffs calculate that VHR sales for CPO vehicles account for more than 36% of the VHRs sold in 2012. *Id.*

Even though the partnership contracts permit auto manufacturers to cancel the agreements after "a term of some years," Plaintiffs allege that the agreements are "de facto long term exclusive agreements" because of Defendant's: (1) overwhelming market share; (2) marketing message that is has no trustworthy competitors; (3) cash and non-cash marketing support payments; and (4) ████████████████████████████████████, and because (5) switching to another VHR provider can take years to accomplish. *Id.* ¶ 515.

The second type of agreement underlying Plaintiffs' complaint is between Defendant and the two leading operators of internet sites listing classified ads for used cars, Cars.com and Autotrader.com. Under these agreements, ███████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████. *Id.* ¶ 516.

The Complaint calculates that because inventory for auto dealers ranges from 45 to 60 days, the number of used car listings annually must be six to nine times the number of monthly listings. *Id.* ¶ 523. Using the 'six times' figure, they reason that the average of 1,873,920 monthly listing for used cars on Autotrader.com offered by franchise dealers translates to 11,243,520 such listings annually, which is 75% of the 14,989,431 used vehicles sold by franchised dealers in the United States in 2012. *Id.* Thus, it says, Defendant's agreement has foreclosed the market for VHRs for 75% of used cars sold by franchised dealers in the United States. *Id.* Using similar calculations, the Plaintiffs allege that Defendant's agreement with Autotrader have foreclosed the market for VHRs for 53% of used vehicles sold by independent dealers. *Id.* ¶ 524. Adding in non-dealers, the Complaint alleges that 47% of the used vehicles sold in the United States are listed on Autotrader, and thus that portion of the market is foreclosed to other VHR providers. *Id.* ¶ 525. The Complaint raises similar allegations regarding Cars.com. Based on Cars.com having 78% the number of listings of Autotrader, Plaintiffs find the foreclosed market shares in each category are 78% what they were for Autotrader. *Id.* ¶¶ 532-34.

Even though Autotrader ███████████████████████████████████████,
Plaintiff alleges that the agreement is a *de facto* long term agreements because of Carfax's market share, its ██████████████████████████████████████████

5

███████████████████████████████████████████████

███████████████████████████████████. *Id.* ¶ 535. The Plaintiffs contend that

other exclusive agreements are likely to be found in discovery. *Id.* ¶ 537.

The Complaint identified the relevant geographic market as the United States, and the

relevant product market is the production and sale of VHRs. *Id.* ¶ 539. Publication and sale of

VHRs to franchised auto dealers is a relevant product submarket, and publication and sale to

independent auto dealers is a second relevant submarket. *Id.* ¶¶ 540-41. Defendant possesses a

90% share in the national market, and in each of the product submarkets. *Id.* ¶ 543.

Plaintiffs say that this market share, combined with consumers' lack of familiarity with

any other provider, Defendant's ability to charge double its competitors' prices without losing

market share, and the existence of significant barriers to entry for competitors indicate that

Defendant has monopoly power in the product market and each submarket. *Id.* ¶ 544. The

barriers to entry include federal and state rules requiring minimum content of VHRs, economies

of scale in collecting information, and economies of scale in marketing and providing service

and support to the entities that need to purchase VHRs. *Id.* ¶ 546.

Carfax's exclusive long-term contracts with 37 of 40 auto manufacturers for CPO

programs lead to significant market foreclosure, as CPO vehicles account for 36% of VHRs sold

annually. *Id.* ¶ 548.

The contracts with the websites resulted in blocking competitors for selling VHRs for at

least 47.3% of used cars sold annually, including 75% of used cars sold by franchised auto

dealers and 53% of used cars sold by independent auto deals. *Id.* ¶ 549.

Plaintiffs claim that the anticompetitive effects of Defendant's exclusive dealing

arrangements include decreased competition that impairs entry of competitors, a reduction in

choice between VHR providers, decreasing quality of VHRs, increased expenses in Plaintiffs'
business operations because of the artificially inflated prices of VHRs, and deprivation of the
opportunity to purchase "the best possible VHRs at the lowest possible prices." *Id.* ¶ 550.

## II.     Motion to Dismiss Legal Standard

When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of
Civil Procedure 12(b)(6), a court must accept as true all well-pleaded facts and draw all
reasonable inferences in the light most favorable to Plaintiffs. *See Kassner v. 2nd Ave.
Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  Although factual allegations are therefore
afforded a presumption of truth, a court is "not bound to accept as true a legal conclusion
couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S.
265, 286 (1986)).  "To survive a motion to dismiss, the plaintiff's pleading must contain
sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

## III.    The Defendant's Documents

In conjunction with its motion to dismiss, Defendant submitted a number of documents to
the court, including its current contracts with auto manufacturers running CPO programs ███
██████████████████████.  Plaintiffs dispute whether the court can consider these
contracts at the Rule 12(b)(6) stage, or if they are extraneous to the complaint and therefore more
appropriately considered at the summary judgment stage. *See Cortec Indus., Inc. v. Sum Holding
L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991).

Documents attached to the complaint as exhibits or incorporated by reference are deemed
to be part of the complaint for the purpose of resolving a motion to dismiss under Rule 12(b)(6).
*Cortec Indus.*, 949 F.2d at 47.  "Even where a document is not incorporated by reference, the

court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

The purpose of the rule against considering extraneous documents is to ensure that plaintiffs have sufficient notice before material is considered by the court. *Chambers*, 282 F.3d at 153. To that end, it is not enough that plaintiffs have notice or possession of the documents that a defendant wants the court to consider; the plaintiffs must have relied on the "terms and effects" of the document in the complaint. *Id.*

There can be no doubt that Plaintiffs rely upon the "terms and effects" of Defendant's many agreements with auto manufacturers and ██████████████████████████ in their Complaint. The allegation that Defendant committed an antitrust violation depends first on the existence of these agreements, and second on the agreements containing the pricing, duration, exclusivity, and non-termination terms contained in the Complaint, as explained in greater detail below. Plaintiff's references to the terms of the contracts indicate that they were in possession of at least some subset of the contracts between Defendant and auto manufacturers, and both of the contracts between Defendant and ███████████████████. *See, e.g.,* Compl. ¶¶ 503 (details about exclusivity), 509 (arrangements with manufacturers require them to require dealers to provide purchasers with Defendant's VHRs), 510 (██████████████████ ██████████████████), 515 (██████████████████████████), 520 (████ ██████████████████████████), 521 ███████████ ██████████████████████), 526 (██████████████████████ ██████████████████), 529 (██████████████████████), 530 (█████████

8



), 535 (                                              ), 557 (

).

Defendant has provided both its most recent contract and previous contracts

, as referred to in the Complaint. *See* Ortmeier Decl. Exs. A & S (Dkt. Nos. 46-1

& 46-19). It has also provided its most recent contract with            . *See id.* Ex. B (Dkt. No.

46-2). Current contracts with                were provided to the Court, along with

. *Id.* Exs. C-O, U-W (Dkt.

Nos. 46-3 to 46-15, 46-22 to 46-24).

Plaintiffs do not dispute that the agreements Defendant has provided to the Court are

authentic. Instead, they claim that they are a cherry-picked subset of Defendant's exclusivity

arrangements, both in terms of the number of agreements Defendant currently has with auto

manufacturers, and in the failure to include past agreements with the auto manufacturers that

were parties to the agreements provided. *Compare* Def't Mot. 12 (Dkt. No. 45) ("Carfax is

providing the Court … the most recent written CPO program agreements with each OEM … .")

*and* Def't Reply 10 (Dkt. No. 55) ("The materials Carfax has provided to this Court are the

precise agreements to which Plaintiffs referred in the Second Amendment Complaint.") *with*

Pls.' Resp. to Def't. Mot. 10-11 (Dkt. No. 48) ("Carfax admits that it only produced *some* of its

*most recent* confidential agreements … .").

Whether the documents provided are a full and complete set of the exclusivity

agreements to which Defendant is currently a party is a disputed issue of fact, and the Court

cannot take it as established that these documents represent all such contracts. No representation

in the Complaint names the complete universe of documents, and indeed Plaintiffs allege that

Defendant has exclusivity agreements that cover 37 of 40 vehicle brands, while ███████

███████████████.[1]  *See* Compl. ¶ 509.  However, to the extent the terms of the

contracts are consistent or inconsistent with the allegations in the Complaint, the Court can take

them into account under *Chambers*.  The Plaintiffs "heavily rely" on the "terms and effects" of

these contracts, and do not dispute that the documents are faithful reproductions of the contracts

that Defendant maintains ███████████████████.  The allegations in the

complaint allay any concerns that the Plaintiffs were not aware of the content of these contracts,

meaning lack of notice is not a concern.

Ultimately, the outcome of Defendant's 12(b)(6) motion does not depend on whether the

additional documents are considered.  The Court would come to the same conclusions both with

and without the documents.  Therefore, the 12(b)(6) analysis that follows will indicate both the

sufficiency of the allegations in the Complaint and the effect of the additional documents.  But

once again, and as the analysis that follows makes clear, the Court's conclusions on the current

motion do not turn on those documents.

**IV.    Clayton Act § 3**

In relevant part, Section 3 of the Clayton Act provides:

> It shall be unlawful for any person engaged in commerce … to lease or make a
> sale or contract for sale of goods, wares, merchandise, machinery, supplies, or
> other commodities … on the condition, agreement, or understanding that the
> lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise,
> machinery, supplies or other commodities of a competitor or competitors of the
> lessor or seller, where the effect of such … condition, agreement, or
> understanding may be to substantially lessen competition or tend to create a
> monopoly in any line of commerce."

---

[1] Some contracts cover multiple brands, such as Honda and Acura, which may account for some of this gap.
*See* Compl. ¶ 513.

15 U.S.C. § 14 (Clayton Act § 3). Exclusive-dealing contracts that foreclose competition in a "substantial share" of the area of commerce affected fall within the proscription of the Act. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). However, for section 3 to apply to an exclusive dealing arrangement, two prerequisites must be met: the exclusive dealing arrangement must be one for goods or other commodities, as opposed to services, and the agreement putting in place the arrangement must be a lease, sale, or contract for sale.

On the first score, it is "well settled that section 3 does not apply to sales of services." *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co., Inc.*, 510 F.2d 1140, 1145 (2d Cir. 1975). Its application is restricted to "tangible products of trade." *Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 156 (2d Cir. 2004) (quoting *May Dep't Store v. Graphic Process Co.*, 637 F.2d 1211, 1214 (9th Cir. 1980)) (interpreting same word "commodities" in Robinson-Patman Act, 15 U.S.C. § 13(a)). When a product has the properties of both a good and a service, courts look to the "dominant nature" of the activity to determine whether it falls under section 3. *Innomed*, 368 F.3d at 156; *see also First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1035 (7th Cir. 1989); *Tri-State Broad. Co. v. United Press Intern., Inc.*, 369 F.2d 268, 270 (5th Cir. 1966). Examples of items found to be "services" and thus outside the scope of the Clayton Act include newspapers advertisements, *see Ambook Enters. v. Time, Inc.*, 612 F.2d 604, 609-10 (2d Cir. 1979), contracting services, *Hudson Valley Asbestos*, 510 F.2d at 1144-45, mutual fund shares, *see Baum v. Investors Diversified Servs., Inc.*, 409 F.2d 872, 874-75 (7th Cir. 1969), news reporting services, *Tri-State Broad. Co.*, 369 F.2d at 270-71, and patent licenses, *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 556 (S.D.N.Y. 2007).

Like all of these examples of non-commodities, Vehicle History Reports are not primarily tangible goods for sale and trade. Defendant deals in information; their sale contracts

11

are for the service of providing data about a vehicle, not for the ultimate physical embodiment of that data. Indeed, Defendant's end-product need not take physical form. It provides the VHRs as electronic .pdf files, which are only reduced to a tangible form if a purchaser makes an independent choice to print them out. A buyer cannot convert a sale of a non-tangible service into one of a tangible good through its own activity that occurs entirely after the sale. *Cf. Nat'l Tire Wholesale v. Wash. Post Co.*, 441 F. Supp. 81, 85 (D.D.C. 1977) (finding printing of newspaper advertisements did not render them a commodity because it was "merely a tangible vehicle for the conveyance" of ideas), *aff'd* 595 F.2d 888 (D.C. Cir. 1979); *Ambook Enters.*, 612 F.2d at 609 (citing *National Tire Wholesale* with approval).

Plaintiffs argue that even the VHRs in .pdf-file form should be considered "commodities" within the meaning of the Clayton Act. They point to a single line from a district court decision in a false advertising case stating that Defendant's VHRs are not published "for the purpose of influencing consumers to buy its goods or services," and instead the "the reports are the goods themselves." *Off Lease Only, Inc. v. Carfax, Inc.*, 2012 U.S. Dist. LEXIS 75234, at *6-7 (S.D. Fla. May 31, 2012). But the court in that false-advertising action was not concerned with the Clayton Act's distinction between commodities and services when it referred to Defendant's product as "goods." It was trying to distinguish between a characterization of the reports as an advertisement and one of the reports as what Defendant was holding out for sale. Similarly, Plaintiffs' reference to *City of Kirkwood v. Union Electric Co.*, 671 F.2d 1173, 1181-82 (8th Cir. 1982), does not undermine the conclusion that VHRs are a service, not a commodity. The *Kirkwood* court held that electricity is a commodity under the Clayton Act; Plaintiff claims that like energy, Defendant's vehicle history data takes up storage space (on servers) and is "collected" and "eventually delivered" by Defendant. But electricity is stored in the same form it

12

is ultimately delivered and used.  The physical manifestation of Defendant's data in digital storage bears no relation to the ultimate service it is offering, and is nothing more than an incidental tangible aspect of that service.

Plaintiffs' analogy between VHRs and newspapers, which the Eighth Circuit stated were commodities in *Morning Pioneer, Inc. v. Bismarck Tribune Co.*, 493 F.2d 383, 389 n.11 (8th Cir. 1974), also misses the mark.  Newspapers always took a physical form in 1974 when that case was decided.  Although the service of information reporting contributed substantially to the ultimate tangible product, the court noted that it necessarily was reduced to a physical product when published, and had no value to consumers outside of that ultimate state.  *Id.*  Even if this reasoning were to control a modern-day Clayton Act analysis, it does not accurately describe VHRs, for which the transmission of information is primary, and its reduction to physical form is a mere occasional happenstance.

That VHRs cannot accurately be understood as a commodity would itself be sufficient to dismiss Plaintiffs' Clayton Act § 3 claim, but Plaintiffs also face the additional problem that the alleged exclusive-dealing contracts are not themselves for the sale or lease of goods.  As the Second Circuit has explained, "Section 3 … prohibits only specified 'sales' or 'contracts for sale.'" *CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 78 (2d Cir. 1999) (alterations omitted).  Accordingly, when the allegedly illegal contract does not involve both a seller and a purchaser, it falls outside of section 3's prohibition.  *Id.*  For example, the plaintiffs in *CDC Technologies* alleged that their competitor, IDEXX Labs, had entered into exclusive dealing arrangements whereby their distributors agreed not to deal in CDC's products.  *Id.* at 76. However, the distributors neither bought nor sold the products produced by the parties, but instead provided only "qualified leads" and in return received a finder's fee from the

13

manufacturer, who would make the sale directly. *Id.* According to the Court, section 3 could not apply to such arrangements, because the exclusive-dealing arrangement by definition did not involve a "sale"—sales were ultimately obtained because of the arrangements, but none were provided for in the arrangements themselves. *Id.* at 78-79.

Like the arrangements at issue in *CDC Technologies*, the exclusive dealing contracts alleged here do not involve any sales of Defendant's products. According to the Complaint, Defendant has entered into contracts with many of the major auto manufacturers and with the two largest internet sources of classified used car listings. Under the contracts, those entities agree to either require their franchised dealerships to provide Defendant's VHRs, or to give Defendant's VHRs a privileged and exclusive place on classified ads, respectively. Notably, Defendant sells VHRs neither to the auto manufacturers nor to the websites with which it maintains these alleged contracts. Sales follow when third-parties affected by the contracts—the Plaintiffs—ultimately buy VHRs from Defendant to satisfy the terms of their arrangements with the manufacturers and websites, but the contracts containing these conditions are not the ones involving Defendant. In short, the contracts for sales of VHRs are separate from the contracts containing the alleged exclusive dealing requirement.

To be sure, the restriction of the Clayton Act to "sales" is often used to dismiss claims when the contract is one for an agency relationship rather than a sale. *See FTC v. Curtis Publ'g Co.*, 260 U.S. 568, 581 (1923) ("[W]e think this contract is one of agency, not of sale upon condition … . This, of courses, disposes of the charges under the Clayton Act."); *Grand Union Co. v. FTC*, 300 F.2d 92, 97 n.14 (2d Cir. 1962) ("Under the antitrust laws the difference between a sale and an agency relationship is not simply one for form, but may be outcome-determinative.") (internal quotation marks omitted); *C.B.S. Bus. Equip. Corp. v. Underwood*

*Corp.*, 240 F. Supp. 413, 424 (S.D.N.Y. 1964) (agency contract not actionable under section 3). But there is nothing in the Clayton Act to make an agency relationship the only way that a contract can fall outside the "sales" requirement.  Defendant's contracts with the manufacturers and websites are not contracts for sales, and thus fall outside of the Clayton Act's scope even though those entities do not become Defendant's agents by the terms of the contracts.

Either the lack of a "commodity" or the lack of a contract for sales would be enough on its own to find that Plaintiffs had failed to state a claim under Clayton Act § 3.  Accordingly, Plaintiffs' first claim for relief in the Second Amended Complaint is dismissed.

### V.     Sherman Act § 1

Unlike the Clayton Act, the Sherman Act is not limited to contracts for sales of commodities.  Sherman Act § 1 declares, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.  In general, a plaintiff alleging a violation of § 1 must show "(1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506 (2d Cir. 2004) (citing *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95-96 (2d Cir. 1998)).

Exclusive dealing arrangements have the potential to violate section 1 by "allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring in the judgment), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).  However, such arrangements may also possess procompetitive virtues, such as "ensuring stable markets and encouraging long-term, mutually advantageous

15

business relationships." *Id.*; *see also E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 8 (1st Cir. 2004) ("[I]t is widely recognized that in many circumstances [exclusive dealing contracts] may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like—and pose no competitive threat at all."). As a result, exclusive dealing arrangements are "presumptively legal" and are examined under the rule of reason. *CDC Techs.*, 186 F.3d at 80.

Under the rule of reason, Plaintiffs bear the initial burden to demonstrate that the agreements have an actual adverse effect on competition. *Geneva Pharm.*, 386 F.3d at 509 (citing *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)). Thus, to survive a motion to dismiss they must plead plausible allegations that, if true, would show such an adverse effect; if Plaintiffs then provide evidence of anticompetitive effects, Defendant will later have the opportunity to show the procompetitive effects of the agreements. *Id.* at 506-07. If Plaintiffs can show direct proof of adverse effects on competition, the Second Circuit has not required a showing of market power in Sherman Act § 1 cases. *See K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995). Alternatively, if Plaintiffs cannot show direct adverse effects, it must at least show that Defendant had market power "and thus the capacity to inhibit competition market-wide." *Id.* (citing *Capital Imaging Assocs., P.C. v. Mohawk Valley Med Assocs., Inc.*, 996 F.2d 537, 546 (2d Cir. 1993)).

## A. Existence of Anticompetitive Agreements

Defendant argues that Plaintiffs have not pleaded facts that would show that the exclusive dealing arrangements could actually harm competition. Although the documents they have provided tend to bolster this argument, at this stage they are not enough to undermine Plaintiffs' plausible allegations that competition is harmed by the exclusive-dealing agreements.

In the first instance, Defendant implicitly concedes that agreements within the contemplation of the Sherman Act exist. It does not deny that it has contracts with the auto manufacturers regarding the VHRs used as part of CPO programs, nor that it has arrangements for display of VHRs on Autotrader.com and Cars.com. The existence of these contracts is enough to satisfy section 1's requirements that the harm to competition be the result of a "contract, combination … , or conspiracy." 15 U.S.C. § 1.

Defendant does offer several reasons why its contracts with the manufacturers and websites should be deemed not anticompetitive as a matter of law. It first contends that the agreements with CPO manufacturers cover an insufficiently large portion of the manufacturers offering CPO programs, such that it would be impossible to show that any significant portion of the market for the sale of VHRs is foreclosed. However, Plaintiffs have alleged the manufacturers of 37 of the 40 vehicle brands that sponsor CPO programs have entered into exclusive-dealing agreements with Defendant for their franchisees' VHRs. Compl. ¶ 509. The Complaint does not indicate what portion of the market is controlled by those 37 brands, but a reasonable inference can be drawn that such a high proportion of the brands represents a significant share of the CPO market, as explained in more detail in the discussion of market foreclosure below. While Defendant claims that ████████████████████████████ ████████████████████████████████████, whether these documents actually represent the full extent of agreements is a disputed fact. Moreover, Plaintiffs allege that Defendant's previous arrangements with manufacturers also show an antitrust violation. The Sherman Act has a four-year statute of limitations, *see* 15 U.S.C. § 15b, meaning it is plausible that contracts predating the current ones could establish a Sherman Act violation. Again,

Defendant will have the opportunity to prove that these allegations are false, but that does not mean Plaintiffs' complaint has failed to state a claim.[2]

Defendant next argues that its contracts with the auto manufacturers and websites are for short time periods and easily terminable, and therefore cannot lead to anticompetitive effects. It is true that exclusive dealing contracts that are "short in duration and terminable at will" generally do not pose a threat of foreclosing enough of the market to cause anticompetitive effects. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 111 (2d Cir. 2002). Indeed, short-term competition for exclusive contracts is often seen as pro-competitive, insofar as it allows purchasers regularly to select a new supplier, and thus encourages both the incumbent and competitor firms to improve prices and product quality. *See Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994). There is no bright-line rule about the length of time that makes a contract 'short-term' as opposed to 'long-term,' but contracts terminable within a year tend not to implicate anticompetitive concerns. *See, e.g., Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1326 (4th Cir. 1995).

The Plaintiffs' allegation is that the agreements are long-term, and ▮▮▮▮▮▮▮▮▮▮▮▮, have a non-terminable period of "some years." Compl. ¶ 515. The typical agreement, they say, lasts for three years. *Id.* ¶ 503. For that time period, CPO-participant dealerships are required to provide one of Defendant's reports to "every consumer shopping for any particular CPO vehicle." *Id.* ¶ 509. Exclusive-dealing arrangements that run for three years are not so short that the potential for harm to competition can be wholly disregarded at this stage in the litigation, or

---

[2] Defendant also explains that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

that procompetitive outcomes can be presumed.  *See Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983) (describing allegation of three-year contracts, "[i]n terms of the case law," as "significant foreclosure").  Defendant replies that it is forced to compete for the contracts with auto manufacturers and the websites, but this is not enough to overcome Plaintiffs' allegations in light of the alleged length of the contracts, and indeed Plaintiffs' example of Defendant's competition for the contract with one manufacturer (Subaru) alleges that the "competition" does not take place over price or product quality, but instead in the form of payments to the manufacturer, who is not itself in the market for VHRs.  Compl. ¶ 511.

The documents provided by Defendant tend to undermine Plaintiff's claims about the length of the average exclusive-dealing contract.  ███████████████████████████ ██████████████████████████████████████████████.  *See* Ortmeier Decl. Exs. A-O (Dkt. Nos. 46-1 to 46-15).  If discovery shows that this set of documents is complete or that ████████████████████████, it may well be the case that Plaintiffs cannot show enough market foreclosure to demonstrate a violation of the Sherman Act.  Given the allegations that this set of documents is incomplete, however, and the aforementioned allegations regarding past arrangements, Plaintiffs' allegations that Defendant's contracts were of sufficient length to harm competition remain plausible.

Plaintiffs also allege that even those contracts that are terminable "after an initial term of some years" remain *de facto* exclusive beyond that point.  *See* Compl. ¶¶ 515, 535.  Plaintiffs' allegations are meant to show that even manufacturers and websites whose contracts allow for termination realistically cannot chose another VHR provider for reasons that have nothing to do with competition between them.  The concept of *de facto* exclusivity is based on the premise that some agreements, though they do not require a contracting party not to deal in its counterparty's

competitor's goods in so many words, still have the effect of being exclusive. *See Tampa Elec.*
*Co. v. Nashville Coal Co.*, 365 U.S. 320, 326 (1961) ("practical effect" of agreement is what
matters). Simply put, it means courts privilege reality over formality when evaluating the
existence of an exclusive dealing arrangement.

The notion that contracts can be *de facto* exclusive is what allows the Plaintiffs to allege
an exclusive contract at all here: the contracts between Defendant and the manufacturers and
websites do not *prohibit* the Plaintiffs from purchasing and supplying customers with VHRs
from other providers. But a dealer that has already purchased a VHR from Defendant under
compulsion from a manufacturer is highly unlikely to purchase a second VHR containing the
same NMVTIS data. Beyond that, Plaintiffs need not rely on a theory of *de facto* exclusivity to
state a claim, because they plausibly allege that sufficiently lengthy exclusive dealing
arrangements exist to state a violation of the Sherman Act.

### B. Unreasonable Restraint of Trade and Foreclosure of Relevant Market

In addition to these allegations showing the existence of potentially anticompetitive
agreements, Plaintiffs must also state allegations showing that these agreements unreasonably
restrain trade. That showing, in turn, has two aspects. First, an exclusive-dealing agreement
cannot unreasonably restrain trade unless it "freezes out" a significant share of sellers from the
relevant market. *Geneva Pharm.*, 386 F.3d at 508 (citing *Jefferson Parish,* 466 U.S. at 45
(O'Connor, J., concurring in the judgment)); *accord Tampa Elec. Co.*, 365 U.S. at 327.[3]
Otherwise, the agreements are insufficiently harmful to competition in the market to violate the
antitrust laws. Second, the Plaintiff must show that the Defendant has sufficient power in the

---

[3] *Tampa Electric Co.* was a Clayton Act § 3 case, but the same rule of reason analysis governs exclusive
dealing claims under both statutes. *Cf. CDC Techs.*, 186 F.3d at 79 ("The conclusion that a contract does not violate
§ 3 of the Clayton Act ordinarily implies the conclusion that the contract does not violate the Sherman Act.").

market to raise an inference that the foreclosure threatens a harm to competition, such as reduced output or higher prices. *See CDC Techs.*, 186 F.3d at 81; *Tops Mkts.*, 142 F.3d at 97; Philip E. Areeda & Herbet Hovenkamp, *Antitrust Law* ¶ 1821 (3d ed.).

### 1. Market Definition

To begin, plaintiffs must allege a relevant market for the sale of VHRs. The "relevant market" has two aspects: the geographic market, and the product market. Plaintiffs allege that the relevant geographic market is the United States. Compl. ¶ 539. Defendant does not contest this geographic market definition, and it is plausible.

The relevant product market, meanwhile, "consists of 'products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.'" *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d at 105 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956)). Other products in the same market provide a substitute that consumers can purchase and thus restrain firms from raising prices on competing goods above competitive levels. *E.I. du Pont de Nemours,* 351 U.S. at 395. "To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a 'rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand.'" *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (quoting *Gianna Enters. v. Miss World (Jersey) Ltd.,* 551 F.Supp. 1348, 1354 (S.D.N.Y.1982)). It must also be "plausible." *Todd*, 275 F.3d at 200.

Plaintiffs' alleged product market is for VHRs generally. Compl. ¶ 539. As Plaintiffs allege, it is rational that a purchaser in this market would find no wholly adequate substitute—for example, an inspection by an auto mechanic might uncover certain damage or other information, but could not provide historical information about the car that a VHR can. *Id.* ¶ 542.

Defendant argues that the market is better understood as used car sales generally—a definition that would radically decrease the market foreclosure and market share percentages plaintiff alleges. At most, this is a question of fact that remains to be answered, because market definition is a "deeply fact-intensive inquiry." *Todd*, 275 F.3d at 199; *see also Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design,* 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition … generally requires discovery."). At least at first blush, Defendant's position seems somewhat illogical; for various reasons, not every purchaser of used cars can be induced to buy VHRs, much like not every purchaser of slacks can be induced to have them dry cleaned, even though dry cleaning would benefit all owners of slacks.[4] The takeaway is that Plaintiffs have plausibly alleged a relevant market.

Plaintiffs have also alleged two submarkets, one composed of VHR sales to franchised auto dealers and one composed of VHR sales to independent auto dealers. "Defining a submarket requires a fact-intensive inquiry that includes consideration of 'such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.'" *Geneva Pharm.*, 386 F.3d at 496 (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962)). Defining a submarket is generally another way of showing that certain products are not reasonably interchangeable in that market, and thus should be evaluated differently. *Geneva Pharm.*, 386 F.3d at 496. As Defendant point out, Plaintiffs' only allegation is that these two submarkets have different customers, so if Plaintiffs were depending on these allegations alone they might be closer to the

---

[4] It may well be that some portion of the used cars not currently sold with VHRs should be included in the relevant market, but that is a matter for factual dispute, not one that defeats Plaintiffs' allegations at the pleading stage.

line. However, on the overall matter of market definition, Plaintiffs have pleaded enough to state a claim that is plausible.

### 2. Market Foreclosure and Market Power

Plaintiffs must also plead that a substantial share of the market has been foreclosed by the exclusive-dealing arrangement at issue. *See Tampa Elec.*, 365 U.S. at 327. According to the Complaint, VHRs were provided for about 34% of all used vehicles sold in the United States in 2012. Compl. ¶ 514. Since CPO programs accounted for over 12% of the total number of used car sales that year, and VHRs are provided for every car sold through a CPO program, Plaintiffs calculate that VHR sales for CPO vehicles accounted for over 36% of the VHRs sold in 2012. *Id.*

Meanwhile, the Complaint extrapolates from the average number of monthly postings on Autotrader.com and the average turnover rate for inventory at car dealerships that 75% of the used cars sold by franchised dealers in the United States were listed on the website in 2012. Compl. ¶ 523.[5]  Similar calculations lead the Complaint to reason that 53% of the cars sold by independent dealers are listed on Autotrader. Adding in non-dealer resellers of cars, the Complaint alleges that 47% of used vehicles are listed on Autotrader, and thus the exclusivity arrangements foreclose that share of the market to other VHR providers. *Id.* ¶ 525. Because Cars.com has 78% the volume of listings as Autotrader, Plaintiffs estimate that Cars.com

---

[5] Specifically, the Complaint explains that inventory for dealerships turns over every 45-60 days, and thus reasons that the number of used car listings annually must be between six and nine times the monthly figure. With an average of 1,873,920 monthly listings for franchised dealers, the Plaintiffs estimate that there are 11,243,520 listings annually by franchised dealers. This number is 75% of the 14,989,431 used vehicles sold by franchised dealers. Compl. ¶ 523.

23

forecloses 36.66% of the market, although how much of that overlaps with Autotrader's 47% is unclear. Compl. ¶¶ 532-34.[6]

Plaintiffs' figures are rough, and it stands to reason that there is significant overlap in the three categories of cars sold through CPO programs, listed on Autotrader.com, and listed on Cars.com. Moreover, it is problematic that Plaintiff calculates the foreclosure share caused by the website agreements based on the total number of used cars sold, without reference to what portion of those cars are listed with VHRs—the very definition of the market that Plaintiffs reject in response to Defendant's suggestion that the market should include sales of all used cars.

Nevertheless, even taking Plaintiff's allegation of foreclosure based on the CPO contracts alone—as that 36% figure is based on VHR sales, not overall used car sales—and assuming (unrealistically) that all of the website listings are overlaps, Plaintiffs' claim is on the border of figures that state a claim. As Defendant points out, "foreclosure percentages of less than 30 or 40 percent in a properly defined market would seem to be harmless to competition." Areeda & Hovenkamp, *supra*, at ¶ 1821c. At the pleading stage, the problem for Defendant is that even this artificial restating of the allegations is not "*less* than 30 or 40 percent." Moreover, Plaintiffs' allegations in the Complaint raise an inference that the actual foreclosure share is higher than this conservative figure. At this stage, the Court draws such inferences in favor of Plaintiffs.

---

[6] ████████████████████████████████████████████████████████████████ ██████████████████. *See* Ortmeier Decl. Ex. A (Dkt. No. 46-1). The contract being terminable on relatively short notice means this portion of the market may not be foreclosed, and to remove ████████████ from the foreclosure analysis would seem to detract significantly from the share of the overall market that is foreclosed. However, it is unclear the extent to which Cars.com listings overlap with Autotrader listings, and if most vehicles are listed on both, ████████████ , because it still forces most customers to buy one of Defendant's VHRs and leaves them with little incentive to buy from competitors. Moreover, ████████████ ████████████████████████████████████████████████. *See* Ortmeier Decl. Ex. S (Dkt. No. 46-19). To the extent allegations based on ████████████ still fall within the statute of limitations, they can support a Sherman Act claim.

In addition to their direct allegations of market foreclosure, Plaintiffs raise claims that the Defendant is leveraging its superior position in the market to secure exclusive dealing contracts and thus exclude rivals. According to the Complaint, Defendant has a 90% market share in the sale of VHRs, with Autocheck maintaining most of the remaining 10% and the other eight competitors in the market all possessing insubstantial shares. Compl. ¶¶ 492, 492-95, 543. Plaintiffs base this figure on an Exhibit attached to the Complaint in a business libel and defamation suit in the Northern District of Illinois. Compl. at Ex. C., *Experian Info. Solutions, Inc. v. Carfax, Inc.*, No. 11-cv-8927 (N.D. Ill. Dec. 16, 2011). The Court may consider this document because it was directly relied on in drafting the Complaint, and as a litigation document it is subject to judicial notice. *See Chambers*, 282 F.3d at 152. That document, a letter sent by one of Defendant's employees to someone at Subaru of America in light of its apparent decision to drop Defendant as its VHR provider, contains the following representation: "JD Power estimates that Carfax's market share is 90% and therefore the consumer is 9 times more likely to see the Carfax report over any other report." Compl. at Ex. C.

Defendant argues that the Complaint does not explain how this 90% market share figure relates to the foreclosure figures discussed in the preceding section. This argument elides the distinction between market share and market foreclosure. A firm can have a market share that exceeds the amount of the market it has foreclosed with exclusive dealing agreements; such agreements do not limit the firm to selling only to entities with whom it can secure such an arrangement. That Plaintiffs do not link the alleged market foreclosure with the alleged market share does not, on its own, undermine either number.[7]

---

[7] Defendant also tries to call into question the accuracy of the 90% figure provided by its own employee. It does so in several ways: first, by stating that the figure was limited to individuals who actually bought VHRs rather than all used car purchasers, and second, by claiming (based on evidence outside the Complaint) that it only relates to online sales. The former argument depends on redefining the VHR market to include all used car sales, which has

In sum, the Plaintiffs' allegations depict the exclusive dealing contracts here as neither so small in their effect on the market nor so plainly benign or beneficial to competition that they have failed to state a claim. The motion to dismiss Count II of the Second Amended Complaint is therefore denied.

## IV.   Sherman Act § 2

Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States, or with foreign nations ... ." 15 U.S.C. § 2. A claim under Section 2 has two elements: first, "possession of monopoly power in the relevant market," and second, "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). An attempt to monopolize, meanwhile, involves showing both of intent to monopolize and a "dangerous probability" that monopolization will be completed. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455 (1993).

### A. Monopolization

To state a claim for unlawful monopolization in violation of Sherman Act § 2, Plaintiffs must first plausibly allege that Defendant has monopoly power in the relevant market. Monopoly power is the power to "control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). A plaintiff can demonstrate monopoly power either by offering direct evidence that the defendant has control over prices or has been able to exclude competition, or it can rely on an inference drawn from the defendant's "large

---

already been rejected. The latter does not suffice to make Plaintiffs' argument facially implausible, particularly in light of Defendant's own reliance on the 90% figure.

percentage share of the relevant market." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97-98 (2d Cir. 1998) (citing *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995)).

The Complaint alleges that Defendant's market share in the nationwide VHR market is 90%, as evidenced by the JD Power reference in the aforementioned exhibit from the *Experian Information Solutions* litigation. *See* Compl. ¶ 492. While determining the existence of monopoly power is a fact-dependent analysis that depends on consideration of the unique features of the market at issue, a market share over 70% is usually "strong evidence" of market power. *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981). Accordingly, the Complaint plausibly states that monopoly power exists.

The existence of monopoly power is half of the analysis. Possession of monopoly power alone is not always harmful, though, and indeed the short-term opportunity for monopoly profits is what attracts participants into new markets in the first place. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). A plaintiff must also show that the defendant participated in anticompetitive conduct in order to create or sustain its monopoly. *Id.*

As the Defendant itself explains, the analysis on this point is essentially the same as it was for Section 1 above. The requisite anticompetitive action alleged in the Complaint is the formation of exclusive dealing contracts that foreclose a significant share of the market. For the same reasons as above, the documents provided by Defendant, if they prove complete or substantially similar to the other documents that form part of Plaintiff's allegations, could undermine any finding of an antitrust violation, but they are not enough to render Plaintiff's allegations implausible at this stage.

Defendant's reference to *Corsearch, Inc. v. Thomson & Thomson*, 792 F. Supp. 305 (S.D.N.Y. 1992), does not compel a different outcome.  In the relevant portion of that opinion, the court was considering whether the defendant's decision to stop selling access to its database of trademarks could violate the Sherman Act. *Id.* at 328-32.  Defendant tries to analogize this cessation of dealings with its rival as "exclusive dealing," but in fact the two are different; keeping one's product to one's self rather than selling it to a rival is not a form of "dealing" at all.  The *Corsearch* court reasoned that terminating its competitor's right to resell its database "was a valid act of an owner of a copyright to protect its marketing strategy." *Id.* at 332.  Whether much of the core information was otherwise available through a government-sponsored database was not controlling of the outcome of that case; the most important difference is that refusal to resell was not an anticompetitive act in the way that preventing purchasers from dealing in competitors' VHRs is alleged to be here.

Accordingly, Plaintiffs have plausibly stated claims that Defendant has monopoly power and has maintained it through anticompetitive conduct.  The motion to dismiss Plaintiffs' monopolization claim is therefore denied.

### B.  Attempted Monopolization

To state a claim of attempted monopolization, a plaintiff must plausibly allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports,* 506 U.S. at 456.  The allegations of anticompetitive conduct stemming from the exclusive dealing contracts suffices on the first point.  On the third point, Defendant's alleged market share is enough to raise an inference that, if it has not already monopolized the VHR market, there is a

dangerous probability that it will do so via its exclusive dealing arrangements, which could make it difficult for its marginal competitors to gain a foothold in the market or challenge its position.

Defendant relies on its previous arguments about its ability to exclude competitors and its purported market share; it does not specifically challenge the existence of specific intent to monopolize. Indeed, proof of anticompetitive conduct can be used to infer a specific intent to monopolize. *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988). Accordingly, Plaintiff has raised allegations regarding each of the elements of an attempted monopolization claim. The motion to dismiss this claim is denied.

## V.    Conclusion

For the foregoing reasons, Defendant's motion to dismiss is GRANTED with respect to Plaintiffs' claim under Clayton Act § 3, and DENIED in all other respects.

This resolves Dkt. No. 29. Docket Nos. 9 and 10 are administratively denied as moot. A separate Order scheduling an Initial Pre-Trial Conference will follow.

SO ORDERED.


Dated:  Sept. 29, 2014
       New York, New York


                                        ALISON J. NATHAN
                                        United States District Judge